**EMPIRE ENERGY MANAGEMENT SYSTEMS, INC., Appellant,**

v.

**James G. ROCHE, Secretary of the Air Force, Appellee.**

No. 03–1277.

United States Court of Appeals, Federal Circuit.

DECIDED: March 24, 2004.

Carter G. Phillips, Sidley Austin Brown & Wood LLP, of Washington, DC, argued for appellant. With him on the brief were Virginia A. Seitz, Joseph C. Port, Jr., Mark P. Guerrera, and Kimberle E. Dodd.

Kyle Chadwick, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Robert D. McCallum, Jr., Associate Attorney General; David M. Cohen, Director; and Mark Melnick, Assistant Director.

Before MAYER, Chief Judge, GAJARSA, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK. Dissenting opinion filed by Chief Judge MAYER.

DYK, Circuit Judge.

The Department of the Air Force ("Air Force") terminated a contract between Empire Energy Management Systems, Inc. ("Empire") and the Air Force for default. The Armed Services Board of Contract Appeals ("Board") sustained the Air Force's default termination. *Empire Energy Mgmt. Sys., Inc.*, ASBCA No. 46741, 03–1 BCA P 32,079, 2002 WL 31501910 (2002). We affirm.

## BACKGROUND

On June 10, 1988, Empire and the Air Force entered into a contract under which Empire was to provide cogeneration[1] ("cogen") of electricity, chilled water, hot water, and steam to MacDill Air Force Base ("MacDill") for a lengthy period of time concluding on October 6, 2019. The Air Force did not agree to pay for the construction of the plant; Empire was required to furnish "all plant, labor, equipment, [and] engineering and perform all operations necessary to furnish, install, own, operate and maintain a cogeneration plant" at its own expense. *Id.* at 158,531. Instead, the Air Force contracted only to

pay for the utility services provided by the cogen plant, at a discount from the market price. The contract specified a commercial operation date ("COD") by which Empire was required to have completed commercial operations acceptance tests successfully and to have substantially completed construction of the cogen plant. The contract also required Empire "to comply with all Federal, State and local environmental and archeological laws and regulations." *Id.* The contract contained several standard contract clauses from the Federal Acquisition Regulations ("FAR"), including the standard FAR default clause, FAR 52.249–8.[2]

On June 11, 1990, the Air Force and Empire entered into Modification 6 of the contract, which obligated Empire to construct two cogen plants at MacDill, rather than the original single plant. In Modification 6, the Air Force agreed to lease the site to be used for the purpose of constructing and operating the second cogen plant (the "cogen site") to Empire for only nominal consideration. The Air Force and Empire subsequently agreed to build only the second cogen plant and to postpone the construction of the first cogen plant. The dispute in this case relates only to the construction of the second cogen plant.[3]

---

1. The contract defined cogeneration as "the simultaneous production of electricity and other utilities at or near, the site of their consumption." *Empire Energy*, 03–1 B.C.A. (CCH) at 158,531.

2. FAR 52.249–8 provides:

(a)(1) The Government may, subject to paragraphs (c) and (d) below, by written notice of default to the Contractor, terminate this contract in whole or in part if the Contractor fails to—

(i) Deliver the supplies or to perform the services within the time specified in this contract or any extension;

(ii) Make progress, so as to endanger performance of this contract (but see subparagraph (a)(2) below); or

(iii) Perform any of the other provisions of this contract (but see subparagraph (a)(2) below).

(2) The Government's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) above, may be exercised if the Contractor does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

48 C.F.R. § 52.249–8 (2003).

3. It appears from the record that the first cogen plant was never built. A dispute between Empire and the Air Force about that plant is involved in a second proceeding before the Board in an appeal docketed as ASBCA No. 46076.

The Air Force had previously used land adjacent to the cogen site for washing fuel bladders. To prevent the release of fuel to the surrounding land and storm drains, it had installed an oil-water separator, a device that uses gravity to separate oil and other petroleum products from water, based on their respective densities. Nonetheless, because some petroleum products are water-soluble, the oil-water separator could not completely eliminate potential pollutants from the water, which was discharged to a storm sewer. The oil-water separator and its discharge were subject to regulation by the United States Environmental Protection Agency ("EPA"). After the cogen site was selected, Empire requested information from the Air Force about the environmental conditions at both the cogen site and the site of the oil-water separator, which the Air Force provided.

Shortly after groundbreaking at the cogen site on February 7, 1991, Empire stopped work on the project because of a dispute with the company through which Empire had arranged financing for the project. This work stoppage continued until May 4, 1992, when the parties executed Modification 7 ("Mod 7") and a novation agreement. Among other provisions, Mod 7 contained a release of all claims that arose from facts and circumstances that existed prior to Mod 7, with an exception not pertinent here. Mod 7 also provided a new completion schedule for the cogen site and a facility charge to be paid monthly by the Air Force after COD. May 4, 1992, the

date Mod 7 was executed, was "the starting date for performance" of the completion schedule, and the COD was set at 300 days from that start date. *Empire Energy*, 03–1 B.C.A. (CCH) at 158,539. Although the COD was set at 300 days from the starting date, or February 28, 1993, the Air Force agreed not to terminate the contract for default within 480 days of the starting date, or 180 days after the COD.[4] Thus, Mod 7 set August 27, 1993, as the first date on which the Air Force could terminate the contract for default ("the termination date"). Mod 7 further provided that the Air Force was required to provide a cure notice allowing Empire at least ten days to cure any default other than the failure to achieve the COD.

Pursuant to the Resource Conservation and Recovery Act of 1976 ("RCRA"), Pub. L. No. 94–580, 90 Stat. 2795 (codified as amended at 42 U.S.C. §§ 6901–87 (2000)), the EPA regulates owners and operators of facilities that generate, transport, treat, store, or dispose of hazardous materials. The EPA's primary regulation of treatment, storage, and disposal facilities is through the RCRA permitting system. Owners and operators of such facilities must have a RCRA permit for the facility; treatment, storage, or disposal of hazardous waste is prohibited without a permit. 40 C.F.R. § 270.1(b)-(c) (2003); *see also* 42 U.S.C. § 6925(a). A RCRA permit allows the operation of a facility for treatment, storage, or disposal and outlines the precautions and corrective actions that the

4. The pertinent provision of Mod 7 provided:
   In accordance with Contract Clause No. 80 entitled "Default", the failure of the contractor to meet obligations established by this contract may be grounds for Termination for Default. Notwithstanding the provision of Contract Clause No. 80, the Government agrees not to terminate this contract for Default for a period of 480 calendar days from the date the contractor finalizes construction financing for the

MacDill Avenue Cogeneration Facility or from 1 July 1992, whichever is earlier. However, the contractor has indicated an intent and expectation of completing construction within 300 calendar days. The parties therefore agree that between the 301st day and the 480th day, the Government shall recover from the contractor anticipated energy savings lost as a result of completion later than the 300th day.
(App. at 2801.)

operator must take to protect the environment.

During the work stoppage, the EPA notified the Air Force on August 15, 1991, that it had issued the corrective action portion of a permit for MacDill pursuant to RCRA.[5] The permit required the Air Force to conduct a RCRA Facility Investigation ("RFI") with respect to several solid waste management units ("SWMU") located throughout MacDill, including the oil-water separator near the cogen site. Although the boundaries of the oil-water separator SWMU are disputed, the Board found that "for purposes of the RFI the [oil-water separator] and an area three to five feet around it was the SWMU." *Empire Energy*, 03-1 B.C.A. (CCH) at 158,-549. Thus, the SWMU encompassed only a small portion of the cogen site.[6] The permit also provided that the Air Force "shall give notice to the Regional Administrator as soon as possible of any planned physical alterations or additions to the permitted facility." United States Environmental Protection Agency, Permit No. FLD 570 024 582, HSWA[7] Portion of the RCRA Permit ("EPA Permit"), at 8 (1991).

On May 15, 1992, shortly after it had started working again in response to Mod 7, Empire investigated the storm sewer near the oil-water separator, where it allegedly discovered oil-based contaminants. Empire stopped working and requested a stop work order from the Air Force on May 19, 1992, stating that "Empire has just become aware that it is being prevented from proceeding with performance by the presence of an unknown quantity of an environmentally hazardous substance on the project site," allegedly left by the oil-water separator. (App. at 1063.) The contracting officer, Ms. Judith Hall, denied Empire's request for a stop work order on May 20, 1992. Empire did not learn of the RFI until June 5, 1992.

The Air Force subsequently hired Dames & Moore, an environmental contractor, to investigate the soil conditions at the site. Between July 21 and July 23, 1992, Dames & Moore took samples throughout the cogen site and tested for organic vapors. Dames & Moore reported:

> The results of the investigation in this report indicate that further site assessment is not required by state or federal rules or regulations.
>
> The site investigation confirmed compliance with all applicable federal, state and local environmental laws and regulations and that the site is suitable to complete construction of the cogen facility.

(App. at 29.) On August 28, 1992, the Dames & Moore report was provided to Empire.

On September 3, 1992, Air Force officials met with an EPA representative and provided the Dames & Moore report to the EPA. The Board found that this meeting also constituted notice to the EPA, in accordance with the permit, that the Air Force intended to change the RCRA site. On December 11, 1992, Ms. Elizabeth Wilde, the EPA representative at MacDill, stated in a letter that, "[b]ased on the

5. This permit, along with a hazardous waste permit issued by the State of Florida, *see* 42 U.S.C. § 6926 (authorizing state hazardous waste programs in lieu of the federal RCRA program), constituted the full RCRA permit for MacDill.

6. We reject Empire's argument that the entire cogen site was covered by the permit. The

Board's finding is supported by substantial evidence.

7. HSWA refers to the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), Pub. L. No. 98–616, 98 Stat. 3221, which amended RCRA.

Dames and Moore report, it appears that [the cogen site] does not warrant further investigation. Therefore this area does not need to be addressed under the RCRA Facility Investigation." *Empire Energy,* 03–1 B.C.A. (CCH) at 158,546 (quoting letter of December 11, 1992, by Ms. Wilde). The Air Force provided this letter to Empire on January 8, 1993, and directed Empire to return to work. However, in a letter dated March 12, 1993, the EPA appeared to contradict the December 11, 1992, letter, by suggesting that the cogen site still required investigation under the RFI. In light of Empire's refusal to work on portions of the cogen site, the Air Force apparently requested an even more definite statement from the EPA. The EPA responded in a letter on June 2, 1993, stating that it did not object to the construction activities planned near the oil-water separator SWMU and that it did not believe that any such activities would interfere with the RFI.[8] The letter was also provided to Empire on that date.

During the work stoppage from May 15, 1992, to May 24, 1993, Empire repeatedly refused the Air Force's demands that it return to work on the cogen site. The Air Force issued a cure notice on April 28, 1993. The cure notice stated:

> I have repeatedly directed you to resume construction of the MacDill Avenue Cogeneration Facility. Therefore, since no reasonable impediments exist to prohibit your construction efforts, your continued refusal at this point must be viewed as a condition which endangers the successful completion of the MacDill Avenue Cogeneration Facility in accordance with the terms and conditions of the contract. *I request you advise this*

> *office in writing no later than 10 May 1993, of your intentions with regard to the resumption of construction* of the MacDill Avenue Cogeneration Facility; *otherwise, the Government may terminate subject contract for default* under the terms and conditions of the Default Clause (FAR 52.249–8) and Part I, Section H, Paragraph 21, Additional Default Provisions, of the contract.

(App. at 1988 (emphases added).) Empire responded to the cure notice on May 10, 1993, asserting that it had continued performance of the contract by continuing its investigation into the cogen site's "environmental status" and that "a fast track construction schedule would enable Empire to achieve the MacDill Avenue Commercial Operation Date on or before 27 August 1993." (App. at 1994.)

Empire resumed work at the cogen site on May 24, 1993, but it remained substantially behind schedule. Empire requested a schedule extension, which the Air Force refused. On August 27, 1993, the termination date set by Mod 7, Empire sent a letter to the Air Force stating that it "ha[d] been led to believe that the Government intends to terminate [the contract] for default" and presenting reasons why such an action by the contracting officer would be "unmerited." (App. at 2422–23.) The letter stated that Empire "is presently performing on schedule and should reach the Commercial Operation Date by mid-December of this year." (*Id.* at 2423.) The contracting officer terminated the contract for default on September 1, 1993, stating that Empire had "failed to meet the [termination date] of 27 August 1993,

---

8. The Board noted that "certain EPA communications inexplicably contradict or conflict with other EPA actions, particularly the 11 December 1992 and 12 March 1993 letters." *Empire Energy,* 03–1 B C.A. (CCH) at 158,549.

It further stated that such actions by the EPA were "confusing" and that "there appears to have been a singular desire [by the EPA] to shield itself from blame." *Id.* at 158,554.

which has never been altered." (*Id.* at 2438.)

Empire appealed the contracting officer's decision to the Board, seeking to recover its costs of more than $30,000,000. After a lengthy factual hearing, the Board found that Empire was entitled to fifty-three days of excusable delay, postponing the termination date until October 19, 1993. *Empire Energy,* 03–1 B.C.A. (CCH) at 158,552. Therefore, it held that the contracting officer had been incorrect in terminating the contract on the ground that the termination date had passed on August 27, 1993. *Id.* at 158,561. Nevertheless, the Board held that the contracting officer had properly terminated Empire for default based on Empire's failure to make progress. The Board found that, based on Empire's progress to only 28% completion as of the government's termination, Empire would have required 154 days to complete the project. *Id.* at 158,-552. The Board further found that "there was no reasonable likelihood Empire could have met COD with a 53 day extension" and that the contracting officer "had a reasonable basis for default termination of the contract on 1 September 1993." *Id.*

The Board also rejected Empire's claims that it had been justified in refusing to work on the site because of environmental concerns. First, the Board found that "construction work could have been done on site without interfering with the RFI work" and that "construction could have proceeded without violating the permit." *Id.* at 158,549. The Board also noted: "We have found that Empire could have proceeded safely, and that it never reached the point where the RCRA investigation prevented it from proceeding." *Id.* at 158,554; *see also id.* at 158,544 ("Empire had sufficient knowledge that it could have proceeded safely and ... Empire never reached a point where it could not proceed because of the RCRA investigation." (citation omitted)).

Second, the Board found that the site was not in fact environmentally contaminated and that Empire's alleged concerns were "unsubstantiated": "[W]e find there was no proof of actionable contamination (matter that violated the environmental laws and regulations of the United States or Florida) or [oil-water separator] malfunction." *Id.* Similarly, the Board found:

There is no evidence of any remediation at or near the [cogen] site, no proof of actionable contamination and MacDill was never cited by EPA for violations of any kind at the [cogen] site.... Thus, we cannot find that the effluent from the [oil-water separator] contained actionable contamination, *i.e.*, matter that violated the environmental laws and regulations of the United States or Florida.

*Id.* at 158,552.

Third, and finally, the Board found that Empire did not in fact have genuine environmental concerns. The Board noted that "the Air Force's concerns that Empire was trying to create a paper trail to support a claim" were credible, *id.* at 158,-542, and that "Empire welcomed the prospect of a delay and the attendant claim," *id.* at 158,557. In addition, the Board stated: "we simply do not believe Empire on the contamination issue," *id.* at 158,554–55, and "[w]e conclude it was posturing when it stopped work," *id.* at 158,558. The Board concluded that it was "not persuaded that Empire ran the risk of criminal liability by continuing work at the site," *id.* at 158,559, and that "Empire's professed concern about civil liability or being held accountable for a regulatory violation (that is, a violation where there is no actual contamination) without EPA approval does not ring true," *id.* at 158,560.

The Board also addressed and rejected additional arguments by Empire, holding that the Air Force had provided the re-

quired cure notice, both because Mod 7 did not require a notice for "failure to achieve" COD and because the April 28, 1993, cure notice was sufficient in any event. *Id.* at 158,562. The Board also held that the Air Force did not waive the right to terminate the contract for default by encouraging Empire to complete the project before the termination date.

The Board entered final judgment against Empire on November 4, 2002. Empire timely appealed on March 4, 2003. *See* 41 U.S.C. § 607(g)(1)(A) (2000). We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## DISCUSSION

### I

We review the Board's decisions on questions of law without deference, but the Board's "decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b).

### II

Empire challenges the default termination on a number of grounds. The first, and most strenuously asserted, is that it would have been "flatly unlawful" for Empire to have commenced work before (1) the Air Force notified EPA of the construction activity and (2) the EPA approved the work. (Br. for Appellant at 33.) We cannot agree.

An understanding of Empire's arguments requires an initial description of the terms of the applicable EPA requirements. Under RCRA, the EPA is authorized and directed to denominate the criteria for identifying hazardous waste and to list particular hazardous wastes that are subject to the requirements of RCRA. 42 U.S.C. § 6921(a)-(b). These criteria and lists are codified in part 261 of Title 40 of the Code of Federal Regulations. Those who treat, store, or dispose of hazardous waste must comply with 42 U.S.C. § 6924 and the regulations the EPA has promulgated pursuant to that statute, which are codified in parts 264–65 of Title 40 of the Code of Federal Regulations.

In this case, the EPA designated Mac-Dill as a hazardous waste facility. Owners and operators of such facilities may not treat, store, or dispose of hazardous waste until they have applied for or received from the EPA a RCRA permit, which governs further activity on the site. *See* 42 U.S.C. § 6925; 40 C.F.R. pt. 270 (2003). Here, the EPA issued a permit for MacDill on August 15, 1991, which required the Air Force to conduct an RFI of four oil-water separator units, including one near the site of Empire's cogen facility. EPA Permit Appendix A–1, at 1. As noted above, the parties and the Board agree that the cogen site encompassed at least a portion of the SWMU.

Empire notes correctly that the permit also required notification to the EPA before any work on the site was undertaken. The permit provided that "[t]he Permittee shall give notice to the Regional Administrator as soon as possible of any planned physical alterations or additions to the permitted facility." EPA Permit at 8; *see also* 40 C.F.R. § 270.30(k)(1). It is also undisputed that the Air Force did not give such notice until at least September 3, 1992, when the Air Force met with the EPA and notified it of the report by Dames & Moore, which the Air Force had hired to investigate soil conditions at the site. The Board found that this meeting constituted notice to the EPA that the Air Force intended to alter the site. *Empire Energy*, 03–1 B.C.A. (CCH) at 158,545.

Empire argues that it was barred from working on the site between June 5, 1992,

the date it learned of the RFI, and at least September 3, 1992. To justify its refusal to continue work on the site, Empire relies upon a threat of an EPA enforcement action against it pursuant to 42 U.S.C. § 6928, the RCRA provision authorizing federal enforcement of RCRA violations. That statute provides for criminal penalties for "[a]ny person who ... knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter ... in knowing violation of any material condition or requirement of [a RCRA] permit." 42 U.S.C. § 6928(d)(2)(B). It also provides for a civil penalty of up to $25,000 per day. *Id.* § 6928(g). The government argues that the notification obligation was upon the Air Force, not Empire, and that Empire has failed to establish that it would have incurred liability if work began before the notification was given. The government argues that only the permittee has a duty to comply with the permit:

> *The Permittee shall comply with all conditions of this permit,* except to the extent and for the duration such noncompliance is authorized by an emergency permit. Any permit noncompliance, other than noncompliance authorized by an emergency permit, constitutes a violation of RCRA and is grounds for enforcement action, permit termination, revocation and reissuance, modification, or denial of a permit renewal application.

EPA Permit at 5 (emphasis added); *see also* 40 C.F.R. § 270.30(a). Indeed, the EPA's permitting authority extends only to "each person *owning or operating* an existing facility or planning to construct a new facility for the treatment, storage, or disposal of hazardous waste." 42 U.S.C. § 6925(a) (emphasis added).[9] The government may be correct that Empire was not bound to comply with the requirements of the permit. However, we need not decide whether Empire could reasonably have been concerned that any of its actions would violate the permit's notification provision.

Even if Empire were entitled to excusable delay for the period before EPA notification, Empire still would not have been able to complete the project in a timely fashion. The fifty-three day excusable delay found by the Board ran from July 21, 1992, the date that Dames & Moore began testing, to September 12, 1992, fifteen days after the Dames & Moore report was provided to Empire on August 28, 1992. *Empire Energy*, 03–1 B.C.A. (CCH) at 158,-552. (The additional fifteen days allowed Empire time to remobilize after the work stoppage.) *Id.* On the assumption that Empire was excused from performing during the entire period from June 5, 1992, when it learned of the RFI, to September 3, 1992, because it was barred from work until the EPA had been notified, Empire would only be entitled to excusable delay for the 106 days between June 5, 1992, and September 18, 1992 (fifteen days after EPA notification), extending the termination date until December 12, 1993. The Board found that, when work on the project was stopped, Empire was 154 days from achieving COD; that is, it would not have reached COD until February 2, 1994.[10] *Id.* Therefore, Empire still would

---

9. *This limited authority is in stark contrast to the EPA's broader authority in other areas. For example, the EPA Administrator is authorized to bring suit "against any person ... who has contributed or is contributing to ... handling, storage, treatment, transportation or disposal" of waste in a way that "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6973(a) (emphasis added).*

10. In footnotes, Empire argues that this finding was erroneous and that it could have achieved COD in 123 days, not the 154 days found by the Board. Empire's argument is that the Board's value of 28% completion is

have had nearly fifty days of unexcusable delay, justifying the Air Force's termination.

Empire seeks to overcome this problem by arguing that it was not required to resume work until June 2, 1993, the date of EPA *approval* of construction activity on the cogen site near the oil-water separator SWMU, giving it a total of 362 days of excusable delay. In the alternative, Empire contends that it is entitled to 217 days of excusable delay, or until January 8, 1993, the date when Empire was notified of the EPA's initial statement that the cogen site "does not need to be addressed under the RCRA Facility Investigation." *Id.* at 158,546 (quoting letter of December 11, 1992, by Ms. Wilde). Such excusable delay would extend the termination date until August 31, 1994, or April 8, 1994, respectively.

While Empire's contention with respect to notification is at least arguably supported by some of the language of the permit, its argument concerning its asserted requirement of EPA approval has no support whatsoever in the permit. The permit imposes sixteen duties and requirements, EPA Permit at 4–10, which are directed to guaranteeing that the EPA remains informed about conditions at the site and planned changes to the site so it can ensure that it will remain able to conduct its investigation. The permit does not require EPA approval for any particular action by the permitee, though. By its terms, the permit only requires that the permittee notify the EPA of planned physical alterations, not that the EPA specifically approve such alterations. Empire cites no legal authority for the proposition that EPA approval was required under the permit.[11] Indeed, Empire returned to work on May 24, 1993, before the approval was given. We reject Empire's claim that it was required to delay work until EPA approval was granted.

### III

At oral argument, Empire presented yet another alternative theory. It argued that, even if EPA approval was not required under the permit, Empire could reasonably have insisted on it before beginning work. The contract required Empire "to comply with all Federal, State and local environmental and archeological laws and regulations." *Empire Energy,* 03–1 B.C.A. (CCH) at 158,531. Empire says that possible environmental problems had been identified at the site, including potential contamination of the soil, and that it was "precluded from engaging in unlawful conduct in connection with the RFI." (Br. for Appellant at 36.) The environmental laws bar "arrang[ing] for disposal or treatment ... of hazardous substances." 42 U.S.C. § 9607(a)(3). Pursuant to this stat-

computed on a cost basis and that, on a time basis, the project was 45.21% complete. (The schedule also included a logic flaw of fourteen days, which must be added to both estimates.) However, the Board's finding is supported by substantial evidence; it relied on a contemporaneous report prepared for Empire's lender, which stated that, on August 30, 1993, "[s]ite construction progress [wa]s estimated to be ... approximately 28% based upon the status observed at the site," (App. at 2427). Substantial evidence also supports the Board's finding that this report did not support Empire's claim that the project was 45.21% complete on a time basis.

**11.** Empire argues that Ms. Wilde agreed with Empire's counsel's statement that EPA "approval" was required before construction could continue. (*See* App. at 2584.) However, such testimony about the meaning of a regulation "should not be received, much less considered, by the Board" in interpreting that regulation. *Rumsfeld v. United Techs. Corp.,* 315 F.3d 1361, 1369 (Fed.Cir.2003). Rather, the Board should directly ascertain legal requirements "based on briefing and argument by the affected parties." *Id.* Here, there is no showing that approval was in fact required.

ute, "a 'disposal' may occur when a party disperses contaminated soil during the course of grading and filling a construction site." *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1512 (11th Cir. 1996); *see also Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1342 (9th Cir.1992); *Tanglewood E. Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988). Under these circumstances, says Empire, it could reasonably insist on EPA approval before resuming work to avoid the risk of environmental liability.

Empire is correct that a contractor may violate the environmental laws if it causes dispersal of contaminated soil, such as through grading and filling of a construction site. And a contractor might argue that it could reasonably insist on not working while awaiting EPA approval if there were reasonable doubt as to whether work on the site would result in a significant violation of the environmental laws.[12] However, the environmental laws are complex; the mere assertion of a colorable claim by the contractor (later found to be meritless) that its actions would violate some regulatory requirement does not excuse performance. Nor would performance be excused by the mere existence of a regulatory investigation, particularly one inspired by the contractor itself.

Here, the Board found that Empire could not have had, and did not in fact have, any reasonable environmental concerns that its action would create a material violation of environmental regulatory requirements, and that Empire's claimed environmental concerns were pretextual. First, the Board found that "construction work could have been done on site without interfering with the RFI work" and that "construction could have proceeded without violating the permit." *Empire Energy,* 03–1 B.C.A. (CCH) at 158,549. Second, the Board found that Empire's alleged concerns about environmental contamination of the site were "unsubstantiated." *Id.* at 158,544. Finally, the Board concluded that Empire "was posturing when it stopped work." *Id.* at 158,558. These findings are supported by substantial evidence. A contractor has no basis to decline to proceed with work because the EPA or other agencies have not yet approved the work if, in fact, the contractor has no reasonable basis for believing that the work would cause a material violation of law. That is the situation here. Empire's claimed environmental concerns and the lack of EPA approval thus provided no basis for Empire's failure to perform.[13]

## IV

■ Empire next argues that time was not of the essence in this contract and that the Air Force could not have terminated

---

12. The Board noted that "Empire was indemnified under the contract" and concluded that the fact that "the Air Force had ordered Empire to continue work with knowledge of the RFI ... shifted any culpability to the Air Force." *Empire Energy,* 03–1 B.C.A. (CCH) at 158,558. The Board therefore held that "[t]he Air Force, not Empire, was ... responsible for any infraction of environmental regulations and the costs attendant thereto." *Id.* at 158,559. However, we are skeptical of the Board's conclusion. An interpretation of a contract requiring the contractor to engage in a material violation of law is disfavored, and

such a blanket indemnity may be unlawful. *See Abraham v. Rockwell Int'l Corp.,* 326 F.3d 1242, 1251–52 (Fed.Cir.2003). We need not reach the propriety of the Board's conclusion, however.

13. The Board also properly held that Empire could not claim delay resulting from any environmental hazards created by the oil-water separator and that Empire's release of all preexisting claims in Mod 7 waived Empire's right to claim any delay as a result of environmental concerns about the oil-water separator, except those arising from the RFI.

the contract because of Empire's delays. However, the existence of a contract deadline itself establishes that time is of the essence. *DeVito v. United States*, 188 Ct. Cl. 979, 413 F.2d 1147, 1154 (1969) ("Time is of the essence in any contract containing fixed dates for performance."). Empire argues that, in this particular contract, time was not of the essence because of the unique nature of the contract, which "placed the risk of failure entirely upon the contractor and its lender and shielded the Government from any consequences resulting from the contractor's failure to perform." (Br. for Appellant at 30.) Thus, Empire argues, any delay caused no harm to the Air Force. However, there is nothing in the contract itself to support this proposition. Rather, the contract specified that failure to meet the COD was a "condition of default." (App. at 2802.)

Nor does our case law offer support for Empire's argument that the liquidated damages provision in the contract militates against a finding that time is of the essence in this case. Instead, our precedent is contrary to Empire's argument. In *Florida, Department of Insurance v. United States*, 81 F.3d 1093 (Fed.Cir.1996), we expressly permitted the government's termination for default, even though the contract contained a liquidated damages provision and even though the government reminded the contractor that "liquidated damages . . . continued to accrue." *Id.* at 1097. Similarly, our predecessor court upheld a termination for default where a liquidated damages clause existed and liquidated damages had been imposed. *Olson Plumbing & Heating Co. v. United States*, 221 Ct.Cl. 197, 602 F.2d 950, 955 (1979). Indeed, *Olson* held that the imposition of liquidated damages "is evidence of the intent to hold the defaulting party liable for its delayed performance." *Id.*

We conclude that time was of the essence in the contract. The Air Force could therefore terminate the contract for default as a result of Empire's failure to achieve COD by the termination date.

## V

■ Empire further argues that the Air Force waived its right to terminate for default for failure to meet COD because the contracting officer encouraged Empire to complete the project, even after she "knew" that COD could not be achieved by the termination date because Empire had fallen so far behind schedule. (Br. for Appellant at 46.) In *DeVito*, we held that:

Where the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right under the Default clause to terminate, assuming the contractor has not abandoned performance and a reasonable time has expired for a termination notice to be given. This is popularly if inaccurately referred to as a "waiver" of the right to terminate. . . . The necessary elements of an election by the non-defaulting party to waive default in delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent.

413 F.2d at 1153–54 (quoting 5 S. Williston, *A Treatise on the Law of Contracts* § 683 (3d ed. 1961)).

Empire relies on several cases from the Board that followed *DeVito*, including *S.T. Research Corp.*, ASBCA No. 39600, 92–2 B.C.A. (CCH) ¶ 24,838, 1992 WL 36978 (1992), and *Composites Horizons*, ASBCA No. 25529, 85–2 B.C.A. (CCH) ¶ 18,059, 1985 WL 16671 (1985). In each of the

cases Empire relies upon, the government's actions occurred *after* the date of default. Here, the Air Force did not waive its right to terminate for default because the contracting officer never elected to allow Empire to continue working past a date on which she believed the Air Force could have terminated the contract for default. Any encouragement given by the contracting officer in this case occurred before August 27, 1993, the first date on which the contracting officer believed she could terminate the contract for default for failure to achieve the COD, and a date well before the October 19, 1993, termination date found by the Board. Such actions by the contracting officer to encourage completion of the work cannot result in a waiver and are entirely permissible. Nor did the contracting officer's statement that, if the cogen plant was "substantially complete" by the termination date, she was willing to discuss an extension, *Empire Energy,* 03–1 B.C.A. (CCH) at 158,551, waive the government's right to insist on continued performance.

## VI

■ Empire also urges that termination for default was inappropriate because it never received a valid cure notice. The contract includes the standard FAR default clause, FAR 52.249–8, which permits the government to terminate for default only if the contractor "does not cure [its] failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure." 48 C.F.R. § 52.249–8(a)(2). Part I, Section H, Paragraph 21 of Mod 7 provides additional default provisions, including the following:

With respect to any condition of default ... other than ... the failure to achieve the MacDill Avenue Commercial Operation Date within the time specified ..., the Contracting Officer shall provide the contractor a cure notice providing a period of 10 days for any longer time reasonably necessary to cure the condition of default, whichever is greater.

(App. at 2802.)

Here, the Air Force issued a cure notice on April 28, 1993, but Empire points out that the only condition of default specified in the cure notice was Empire's failure to begin work. The notice states:

I have repeatedly directed you to resume construction of the MacDill Avenue Cogeneration Facility. Therefore, since *no reasonable impediments exist* to prohibit your construction efforts, your continued refusal at this point must be viewed as a condition which endangers the successful completion of the MacDill Avenue Cogeneration Facility in accordance with the terms and conditions of the contract. I request you advise this office in writing no later than 10 May 1993, of your intentions with regard to the resumption of construction of the MacDill Avenue Cogeneration Facility; otherwise, the Government may terminate subject contract for default under the terms and conditions of the Default Clause (FAR 52.249–8) and Part I, Section H, Paragraph 21, Additional Default Provisions, of the contract.

(App. at 1988.) Empire urges that, once it began work on May 24, 1993, the notice was no longer effective since the only default it identified was the failure to resume construction, and a new notice was required. That is not correct.[14]

---

14. The Board held that the Air Force was not required to provide a cure notice because Mod 7 did not require a cure notice for "failure to achieve" COD. *Id.* at 158,562. Because we hold that the April 28, 1993, cure notice was sufficient, we need not determine whether the Board's alternative holding in this respect was proper.

In *Halifax Engineering, Inc. v. United States*, 915 F.2d 689 (Fed.Cir.1990), we addressed and rejected a similar argument. In *Halifax*, the contractor received a cure notice providing that failure to start performance on the specified date "will be grounds for immediate termination for default." *Id.* at 690. The contractor argued "that the letter [was] legally inadequate because it fail[ed] to specify the defects that formed the basis for the default." *Id.* at 691. However, we held that the notice was sufficient because it was apparent from the circumstances that the contractor "had sufficient notice of the asserted defects." *Id.* Thus, under *Halifax*, if the contractor has actual notice of the nature of the government's concerns and its intention to terminate for default if those concerns are not rectified, default termination is permissible without a formal cure notice, at least so long as the contractor has previously received a formal, written cure notice directed to a related concern. *See also Am. Marine Upholstery Co. v. United States*, 170 Ct.Cl. 564, 345 F.2d 577, 581 (1965) (holding that a cure notice's failure to "specify the particular failure for which [the government] might terminate the contract" did not render the notice defective because the contractor "had sufficient notice" of the government's intent to terminate the contract for default).

In this case, Empire received a formal, written cure notice showing that the Air Force's primary concern was "the successful completion of the MacDill Avenue Cogeneration Facility in accordance with the terms and conditions of the contract," including the termination date. (App. at 1988.) In addition, the contracting officer repeatedly stated that an extension of the termination date "was unacceptable" and that, at a minimum, Empire had to substantially perform the contract by the termination date specified in the contract. *Empire Energy*, 03–1 B.C.A. (CCH) at 158,551. As late as August 17, 1993, the contracting officer reminded Empire that it "still ha[d] not cured the situation and still ha[d] not addressed our concerns." (App. at 2414.) Therefore, as in *Halifax*, Empire "had sufficient notice of the asserted defects" in its performance. 915 F.2d at 691. The fact that the cure notice was directed more specifically at "the resumption of construction" does not require the Air Force to provide another formal cure notice simply because Empire returned to work, but failed to achieve COD before the termination date. (App. at 1988.)

## VII

■ Finally, relying primarily on language in our opinion in *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006 (Fed.Cir.2003), Empire argues that the default termination was improper because the contracting officer did not conduct an analysis or form a subjective belief that the conditions for default termination were satisfied.

The contract provided that default termination was proper in two circumstances: (1) if Empire failed to meet the COD and (2) if it failed to "[m]ake progress, so as to endanger performance of this contract." 48 C.F.R. § 52.249–8(a)(1)(ii). The contracting officer terminated Empire for default because Empire had not achieved COD by the termination date. The Board, however, found that the termination date had not in fact passed on the date of the contracting officer's termination because Empire was entitled to a time extension of fifty-three days. *Empire Energy*, 03–1 B.C.A. (CCH) at 158,552. Nonetheless, the Board sustained the termination on the ground that "there was no reasonable likelihood Empire could have met COD with a 53 day extension" because it found that Empire was 154 days from completion. *Id.* Therefore, the Board found that the contracting officer "had a reasonable basis

for default termination of the contract on 1 September 1993," when she issued the notice of termination. *Id.* We have held above that, even assuming that Empire was entitled to 106 rather than fifty-three days of excusable delay, under the Board's decision, there still was no reasonable likelihood that Empire would have achieved the COD in time to avoid default termination.

Our decisions have consistently approved default terminations where the contracting officer's ground for termination was not sustainable if there was another existing ground for a default termination, regardless of whether that ground was known to the contracting officer at the time of the termination. *See, e.g., Kelso v. Kirk Bros. Mech. Contractors, Inc.*, 16 F.3d 1173, 1175 (Fed.Cir.1994) ("This court sustains a default termination if justified by the circumstances at the time of termination, regardless of whether the Government originally removed the contractor for another reason."); *Joseph Morton Co. v. United States*, 757 F.2d 1273, 1277 (Fed. Cir.1985); *Pots Unlimited, Ltd. v. United States*, 220 Ct.Cl. 405, 600 F.2d 790, 793 (1979) ("[I]t is settled law that a party can justify a termination if there existed at the time an adequate cause, even if then unknown."). Thus, the subjective knowledge of the contracting officer herself is irrelevant, and the government is not required to establish that the contracting officer conducted the analysis necessary to sustain a default under the alternative theory.

Empire urges that *McDonnell Douglas* adopted a special rule for terminations for failure to make progress, requiring analysis of "the contracting officer's reasonable belief," 323 F.3d at 1017, rather than objective considerations. In *McDonnell Douglas*, two contractors who were awarded a contract to design and build aircraft carrier-based stealth aircraft were terminated for default when they failed to meet an extended deadline to deliver the first aircraft. *Id.* at 1010–11. The delivery of the first aircraft was merely an interim milestone, not the ultimate performance requirement of the contract. Nevertheless, the government terminated for failure to make progress. *Id.* at 1015. We held that, in such cases, a default cannot be declared simply because the contractor has failed to meet an interim milestone. The default provision "require[s] reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance." *Id.* at 1016 (quoting *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir. 1987)).

Thus, Empire argues, the contracting officer could not properly have terminated for failure to make progress because she did not specifically consider whether Empire could have completed the project within the period of excusable delay. This argument finds no support in our previous decisions. We have expressly held that the government must show in termination for failure to make progress cases "that it was reasonable for the [government] to conclude that [the contractor] would be unable to complete the project *by what the Board found to be the proper completion date*." *Danzig v. AEC Corp.*, 224 F.3d 1333, 1336 (Fed.Cir.2000) (emphasis added); *see also Lisbon*, 828 F.2d at 765. *McDonnell Douglas* is not to the contrary. Indeed, *McDonnell Douglas* demands an objective inquiry, not an evaluation of the contracting officer's subjective beliefs. 323 F.3d at 1016 ("[A] court's review of default justification does not turn on the contracting officer's subjective beliefs, but rather requires an objective inquiry."). It requires the court to consider whether the contracting officer's decision to terminate for failure to make progress was reason-

able given the events that occurred before the termination decision was made. *Id.* at 1017.

This is precisely the analysis the Board undertook in this case. It found that, on the termination date, Empire would have required 154 days to complete the project, but that it was entitled to only fifty-three days of excusable delay. We have held that the Board was correct at least to the extent that the excusable delay did not exceed 106 days. The Board's conclusion that "Ms. Hall had a reasonable basis for default termination of the contract on 1 September 1993" was supported by substantial evidence. *Empire Energy*, 03–1 B.C.A. (CCH) at 158,552. Accordingly, the Board properly sustained the Air Force's termination of the contract for default.

## CONCLUSION

For the foregoing reasons, we affirm the Board's decision.

*AFFIRMED.*

## COSTS

No costs.

MAYER, Chief Judge, dissenting.

Because I believe that Empire reasonably waited to receive EPA approval before resuming work required under the contract, and because that excusable delay would be more than sufficient to allow Empire to meet the extended commercial operation date ("COD"), I dissent.

Contrary to the court's suggestion, Empire does more than provide a "mere assertion of a colorable claim ... that its actions would violate some regulatory requirement" if it had complied with the government's orders to resume work. *Ante* at 1353. More accurately, Empire reasonably could have expected to be held liable for violations of federal environmental law if it had complied. The board itself found that as of May 1991, "Empire knew

or should have known ... that the [oil-water separator] represented a potential environmental problem." *Empire Energy Mgmt. Sys., Inc.*, ASBCA No. 46741, 03–1 B.C.A. (CCH) ¶ 32,079, at 158,541, 2002 WL 31501910 (2002). Empire had additional reason to suspect the existence of hazardous waste at the project site when on June 5, 1992, it learned of the Resource Conservation and Recovery Act Facilities Investigation ("RFI")—an investigation specifically requested because of concerns raised in a previous RFI. As of June 5, 1992, therefore, prudence prohibited Empire from resuming work at least until it received notification that the project area was not contaminated; otherwise it would have been exposed to potential liability, indemnification clause notwithstanding. *See* 42 U.S.C. § 9607(a)(3) (2000) (prohibiting the arrangement for disposal of hazardous waste); *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1512 (11th Cir.1996) ("a 'disposal' may occur when a party disperses contaminated soil during ... construction").

The court notes the board's conclusion that "construction work could have been done on site without interfering with the RFI work." *Ante* at 1353. As of June 5, 1992, however, Empire would have had no way to know whether its work would interfere with testing, and more importantly, whether its work would be conducted on contaminated soil. As the board itself stated, "If the sampling produced evidence of contamination, sampling would then proceed further out." *Empire Energy*, 03–1 B.C.A. (CCH) at 158,549. Prior to the conclusion of sampling, then, Empire would have had no knowledge of the extent to which contamination infected the project site. Because the entire project site was contained within the RFI site, Empire could only wait until it had received notification of the RFI's completion—notification that must come from the EPA—be-

fore it could be confident that project work would not violate federal law.

Presuming that the first notification Empire received from the EPA was sufficient to exonerate Empire of any potential liability, excusable delay would run from June 5, 1992, to January 8, 1993. This was 217 days—obviously more than the 154 days the board determined Empire needed to achieve COD. Indeed, in light of EPA's vacillation, confusion, and self-protectiveness, *id.* at 158,549; 158,554, Empire has a good argument for excusable delay through June 2, 1993, lest it be left holding the bag if EPA had changed its position. I would therefore reverse the board's decision and convert the termination for default into one for convenience.