# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| MOQA-AQYOL JV, LTD. ) | ASBCA Nos. 57963, 60456 |
| ) | |
| Under Contract No. W5J9JE-10-C-0031 ) | |

APPEARANCE FOR THE APPELLANT:    Thomas J. Fraser, Jr., Esq.
                                 Eavenson, Fraser, Lunsford & Ivan
                                 Jacksonville, FL

APPEARANCES FOR THE GOVERNMENT:  Thomas J. Warren, Esq.
                                   Acting Engineer Chief Trial Attorney
                                 Daniel B. McConnell, Esq.
                                 Rebecca L. Bockmann, Esq.
                                   Engineer Trial Attorneys
                                   U.S. Army Engineer District, Middle East
                                   Winchester, VA

## OPINION BY ADMINISTRATIVE JUDGE O'CONNELL

These appeals arise from a contract to build an Afghanistan National Police Uniformed Police District Headquarters facility in Dasht-e Qal'eh, Takhar Province, Afghanistan. The government's termination for default is at issue in ASBCA No. 57963 and appellant's monetary claim in ASBCA No. 60456. The Board conducted a hearing from 6-18 January 2017 in Falls Church, Virginia. After providing the parties the opportunity to file post-hearing briefs, the Board heard closing arguments on 15 June 2017. We deny the appeals.

## FINDINGS OF FACT

### I.    The Contract

1. On 5 May 2010, the U.S. Army Corp of Engineers (Corps or USACE) awarded appellant, MOQA-AQYOL JV LTD. (MOQA), a contract to adapt a USACE design for a district headquarters compound that consisted of a one-story building for 60 police, a dining facility, berthing and offices/conference areas, armory and jail cells, force protection structures, electrical system, plumbing/sewage system, and water system (R4, tab 7 at 36, 41-42; tr. 4/210, 7/223-24).

2. The original contract price was $1,490,804.67, with a term of 365 days plus weather days as specified per province (R4, tab 7 at 2, 33, 36). The original contract failed

to include Takhar Province, however (*see id.* at 159-61), and thus failed to include the required weather days. The Corps corrected this a year later in Modification No. A00003, which, in relevant part, added 62 calendar days to the contract term (R4, tab 11 at 2).

3. A few words on project participants are in order because they illustrate the challenges in building this project. At the hearing the Corps presented testimony from five of its employees but none of them actually went to the project site because it was deemed too dangerous for American civilians (tr. 1/34, 2/15). The Corps monitored the site from a resident office in Kunduz (tr. 1/33) and headquarters in Kabul (tr. 2/76, 4/267, 294, 323). The Corps employees were stretched thin; its quality assurance representative testified that he was responsible for 20 projects (tr. 2/15-16).

4. Through a separate contract the Corps retained native Afghans to act as its eyes and ears on the site; specifically, a local national quality assurance representative (LNQA), who was supervised by a local national project engineer who, in turn, was supervised by a local national deputy resident engineer (tr. 2/16-17, 4/245). The LNQA sent the USACE quality assurance representative a daily report and photos (tr. 1/34, 2/15). Neither party presented testimony from these contract employees. The main LNQA, Habibullah Khadaam (*see* R4, tab 456), is a source of considerable controversy; as we will discuss, depending on who you believe, Mr. Khadaam is either a competent young man who was perhaps too patient with MOQA or a disgruntled former MOQA employee looking to settle a score.

5. Due to the work load of Corps employees, the Corps also retained Michael Baker Jr., Inc., to review schedules (tr. 1/49), but no employees of that firm testified even though scheduling issues are in dispute. Similarly, although geotechnical and design-related issues played a prominent role on this project, neither party presented testimony from a designer or geotechnical professional. Two employees of MOQA testified, its president and chief executive officer, Murad Hamidi, and its program manager from August to October 2011, Jonathan Griffin (tr. 5/283). Mr. Griffin testified that he went to the site on just two occasions, including once with Mr. Hamidi (tr. 5/317). There is no evidence that Mr. Hamidi made additional site visits.

6. After the Corps terminated MOQA for default, it retained another contractor to complete the project, which it also terminated (R4, tab 202). A third contractor completed the work (R4, tab 211). Although MOQA's monetary claim is based in large part on materials and equipment left on site, and work successfully completed, no one from either of the replacement contractors testified.

II.   Delays and Other Problems

7. The project suffered from a number of delays and the Corps found fault with a number of aspects of MOQA's performance. The Corps terminated the contract about

2

three weeks before the 22 November 2011 completion date (on 31 October 2011). MOQA concedes that it could not complete the project by 22 November; its expert projected a completion date of 27 May 2012 (tr. 7/234). The dispute lies in which party was responsible for delaying the project so that it could not be completed until six months (or more) after the scheduled completion. An overview of the delay issues is as follows.

A.     The License for Construction Delay

8. The Corps issued a notice to proceed with work to begin on 20 May 2010 (R4, tab 21), but the contracting officer soon had to suspend all work (on 27 May) because the Corps had not obtained a license for construction (R4, tabs 23, 26; tr. 3/186). The Corps obtained the license and ordered MOQA to resume work on 25 August 2010 (R4, tab 34). The parties subsequently executed bilateral Modification No. (Mod.) A00002 on 8 December 2010 that added 92 days and $190,450 to the contract (R4, tab 10). The modification provided that:

> It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor...for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto...and for performance of the change within the time frame stated.

(*Id.* at 2) (Emphasis added) ("Release Language")

B.     The Compound Size Change

9. The contract required construction of the compound in a maximum 75 x 75 meter area (R4, tab 7 at 42), but the license for construction provided for a 70 x 130 meter area (R4, tab 51). Although MOQA contends in its brief (page 14) that the Corps did not tell MOQA about the size change until 13 January 2011, the record demonstrates that MOQA knew about the change by June 2010 (R4, tab 288 at 10-12, tab 502 at 64; tr. 7/50-52).

10. On 18 January 2011, the Corps issued a request for proposals (RFP-0001) to perform the work resulting from the compound size change. The RFP stated that MOQA should add 30 days to the contract completion date "to allow items such as additional surveying, demining, grading, and construction." (R4, tab 51 at 1) It also cautioned MOQA that it was not a notice to proceed and that MOQA should not begin work until it received a signed modification (*id.* at 2).

3

11. The parties thereafter executed bilateral Modification No. A00003 on 7 May 2011 (R4, tab 11). This modification increased the contract price by $406,000 and added 92 days to the completion date (30 for the size change and 62 for the weather days omitted from the original contract as described above). The modification contained the same Release Language as Mod. A00002 (*id.* at 2-3). The addition of these days changed the completion date from 22 August to 22 November 2011, where it would remain through the date of termination.

## C.     Problems with Submittals

12. Contract section 01312, Quality Control System, provided that the Corps would use the "Resident Management System for Windows" (RMS) to monitor and administer the contract. It required MOQA to use the Construction Contractor Module of RMS, referred to as QCS, to record, maintain, and submit various information throughout the contract period. The contract explained that this "joint Government-Contractor use of RMS and QCS will facilitate electronic exchange of information and overall management of the contract." (R4, tab 7 at 172) The contract required MOQA to use QCS to track and transmit all submittals and to use QCS to produce a register (*id.* at 177). Contract section 01335, Submittal Procedures for Site Adapt Projects, similarly specified that MOQA was responsible for maintaining and updating this register, which would be considered the "controlling document" for submittals (*id.* at 213).

13. The contract provisions concerning the RMS/QCS system and MOQA's responsibility for tracking submittals are important because there are a number of purported submittals discussed below that MOQA did not record in the QCS/RMS submittal register (*see* R4, tab 155). For some of these, the government acknowledges that it received them, not through QCS/RMS, but rather as an attachment to a MOQA letter or email (*see* gov't reply at 27-28). But the government denies receiving some documents that MOQA contends that it submitted. MOQA contends that something "nefarious" occurred, alleging that it uploaded them using QCS but they were "deleted" from the register, albeit without any proof (app. br. at 94; tr. 8/205).

### i.     The Design Submittals and the Geotechnical Report

14. The contract required MOQA to submit 10, 65, 90 and 100% design submittals. The contract barred MOQA from beginning work until the Corps had approved all design submittals. (R4, tab 7 at 192) (The contract did provide that after acceptance of the 65% design submittal the Corps could issue a clearance for construction for work that included the foundation and all building features (*id.* at 32), but the Corps never issued more than a narrow clearance, as discussed below.)

15. Once MOQA submitted the 10% design, the Corps had 14 days to provide its comments (R4, tab 7 at 33). Once the Corps provided the 10% design comments, MOQA

then had 14 days to submit the 65% design in which it had to address satisfactorily the 10% review comments. These same deadlines (that is, 14 days to submit and 14 days to review) applied to the 90 and 100% design submittals. (R4, tab 7 at 33)

### a. The 10% Design

16. The purpose of the 10% design was to ensure that MOQA had developed a test well and had produced a geotechnical investigation report (R4, tab 7 at 192). MOQA entered in the submittal register that it submitted the 10% design on 11 November 2010 (R4, tab 155 at 1).

17. The Corps provided its review comments and gave the 10% design a "C" code on 27 November 2010, or two days late (R4, tab 155 at 1, tab 502 at 31). A "C" code means that the submittal is "Cleared for Construction, except as noted in attached comments, resubmission required"[1] (R4, tab 7 at 220). The contract required the contractor to review each comment, provide a response in the USACE "DrChecks" system as to how the comment would be addressed in the design. MOQA was then supposed to incorporate each comment in the next design submission and then "furnish disposition of all comments in DrChecks" with that next submittal. (*Id., see also id.* at 33)

18. MOQA resubmitted the 10% design on 4 January 2011, 38 days after the Corps review comments. The Corps approved the submittal with a "B" code 12 days later (16 January). (R4, tab 155 at 1)

### b. The Geotechnical Report

19. At some point (it is not clear exactly when), the parties agreed to treat the geotechnical report as a separate submittal from the 10% design (tr. 5/154, 6/202, 214, 7/70). MOQA recorded submission of the geotechnical report on 1 December 2010 (R4, tab 155 at 1). MOQA nevertheless contends that it submitted that report with the 10% design on 11 November 2010. We have reviewed the various documents cited by the parties (R4, tabs 260, 276, 388) but find that none clearly indicates that MOQA submitted the geotechnical report earlier than the date MOQA entered in the submittal register, which we find to be the best evidence of the submission date.

---

[1] The review codes are:
  A – Cleared for Construction
  B – Cleared for Construction, except as noted in attached comments
  C – Cleared for Construction, except as noted in attached comments, resubmission required
  E - NOT Cleared for Construction, see attached comments, resubmission required (R4, tab 7 at 220).

5

20. Contract section 01015, Technical Requirements – Site Adapt, stated that there was no geotechnical information available for the project site and required MOQA to obtain the data to develop foundations and other geotechnical related design and construction activities through field and laboratory investigations and analyses (R4, tab 7 at 79). To produce the geotechnical report, MOQA retained Pamir Geotechnical Services Co. (Pamir Geotech) (R4, tab 388 at 8). No one from Pamir Geotech testified at the hearing.

21. The technical requirements section of the contract provided that the building foundations had been designed for a soil bearing capacity of $0.75 kg/cm^2$ and required MOQA to confirm that the soil bearing capacity was no less than this amount. In a key requirement, this section required MOQA to redesign the footings if the geotechnical investigation showed a bearing capacity less than $0.75 kg/cm^2$. (R4, tab 7 at 80) The contract further required MOQA to provide an estimated settlement for building foundation loads in the geotechnical report (*id.* at 192).

22. In its report, Pamir Geotech recorded the presence of thick deposits of loess (or "collapsible") soil, a type of loose, windblown silt, not suitable for construction (R4, tab 388 at 1, 17; tr. 5/79). It found that the bearing capacity of the soil was less than the $0.75 kg/cm^2$ required by the contract, and was either 0.69 or 0.73, depending on the testing method (R4, tab 388 at 31, 34).

23. The Corps reviewed the geotechnical report and returned it to MOQA with a "C" code on 20 December 2010, or five days after the 14 days specified in the contract (R4, tab 155 at 1, tab 388 at 1). In its response, one Corps reviewer noted that the contract "technically" required MOQA to redesign the footings because it showed the bearing capacity to be less than $0.75 kg/cm^2$. However, he opined that the design would not need to be changed had Pamir Geotech considered the actual footing width rather than an assumed width of one meter, and stated that MOQA should have Pamir reanalyze the results using the actual footing width[2] (R4, tab 388 at 4).

24. The Corps submittal response also required MOQA to perform a test to measure the collapse potential of soils as set forth in American Society for Testing and Materials (ASTM) D 5333-96, a test not required by the contract. (Mr. Hamidi testified at the hearing that this test took one to three days to perform (tr. 7/96).) Finally, the Corps also observed that MOQA had failed to complete the maximum settlement estimates required by the contract (R4, tab 388 at 4).

25. MOQA appears to have done little to advance the geotechnical report or determine if the footings needed to be redesigned for five weeks following the 20 December USACE comments. Finally, on 25 January 2011, it submitted a request

---

[2] MOQA did not provide the Board any analysis of the time impact of performing this analysis compared to the contractual requirement to redesign the footings.

6

for information (RFI-0004) to the Corps that referenced USACE's 20 December geotechnical comments, and asked the Corps to provide the dead loads (the weight of all materials of construction incorporated in the buildings) (R4, tab 55 at 1-2, tab 7 at 81). The Corps did not provide MOQA the dead loads, but it did respond to the RFI on 31 January 2011 by stating that it would issue an RFP as a result of the soil bearing capacity issue (R4, tab 55 at 1).

26. In its reply brief, MOQA states that the Corps had agreed to provide MOQA the dead loads but it fails to provide any record citation (app. reply at 7). Our review of the contract does not reveal any such promise. An internal Corps email indicates that the Corps did not have the dead loads (R4, tab 422 at 124). MOQA acknowledges in its reply brief that it was able to calculate the dead loads (app. reply at 7).

27. MOQA failed to submit the revised geotechnical report until 12 February 2011 (54 days after the USACE comments); the Corps provided its comments 5 days later on 17 February 2011 (R4, tab 155 at 1). While MOQA addressed the ASTM test for collapsible soils, it once again failed to provide the settlement estimates and the Corps again gave the report a "C" code, requiring MOQA to resubmit it (R4, tab 278). MOQA submitted the report for a third time on 17 March 2011 (one month after the USACE comments) and the Corps approved it with a "B" code three days later (R4, tab 155 at 1).

c.     RFP-0002 & -0003: Solving the Soil Problems

28. The contract provided that, unless otherwise indicated, "the risk for the design is the sole responsibility of the Contractor" (R4, tab 7 at 192). Despite allocating this risk to MOQA (including the obligation to redesign if the soil had a bearing capacity less than $0.75 \text{ kg/cm}^2$), the Corps accepted that it did not require MOQA to do additional construction work not specified in the contract. In its response to RFI-0004 (MOQA's request for the dead loads), the Corps stated: "We concur that site conditions have changed from the site adapt design documents for soil bearing capacity. An RFP will be forth coming to redesign the foundations for buildings and associated costs." (R4, tab 55 at 1)

29. On the following day (1 February 2011), the administrative contracting officer (ACO) issued RFP-0002, in which she acknowledged a differing site condition because the soil had a bearing capacity less than the $0.75 \text{ kg/cm}^2$ required by the contract. She directed MOQA to reflect the changes in the 65% design drawings and to submit within seven days (8 February 2011) an itemized proposal for performing the work. She also cautioned MOQA that this was not a notice to proceed with the work and that it should not begin performing the work until it had a signed modification. (R4, tab 59)

30. MOQA did not seek clarification of RFP-0002, nor did it inform the Corps that it could not submit a proposal without the dead loads. But MOQA did not submit a proposal or seek an extension by the 8 February deadline. Another month passed without

7

MOQA submitting a proposal and on 9 March 2011 the ACO canceled RFP-0002 (R4, tab 61).

31. The record suggests that the Corps grew impatient with MOQA's inaction. In a 13 March 2011 email to the Corps resident engineer, a Corps employee stated that she had analyzed the problem and found that the collapsible soil was shallow enough that it could simply be removed and replaced with good soil (R4, tab 391). On 30 March 2011, the ACO issued RFP-0003 in which the Corps sought a cost and time proposal to "[m]odify site excavation and backfill to account for and mitigate the existence of collapsible soils at the project site" (R4, tab 435 at 2). The RFP provided for over excavation of the collapsible soils to a depth of three meters below the bottom of the foundation within the building footprint and replacement with backfill meeting criteria specified in the RFP (*id.* at 4). The Corps asked MOQA to provide its proposal by 7 April 2011 (*id.* at 1). Once again the ACO told MOQA that the RFP was not a notice to proceed and that it should not begin work until it had a signed modification (*id.* at 4).

32. MOQA submitted a proposal on 11 April 2011, four days later than the ACO had requested (R4, tab 70 at 6). MOQA did not request more time but sought an additional $1,599,726.20, which was about triple what the Corps had estimated (R4, tab 454) and more than the original contract price, in part because MOQA included costs for the cancelled RFP-0002 (R4, tab 79 at 13).

33. Thereafter, the parties entered into protracted negotiations and MOQA revised its proposal four times (R4, tab 422 at 99). Ultimately, the parties signed bilateral Modification No. P00003 (Mod. P00003) on 28 May 2011, for compensation in the amount of $475,000 with no additional time (R4, tab 12 at 4). Mod. P00003 included Release Language similar to the earlier modifications but stated that the contract term had not changed:

> It is understood and agreed that pursuant to the above, <u>the contract time is not affected</u>, and the contract price is increased as stated above.... It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the Contractor...for all costs and markups directly or indirectly attributable for the change ordered, <u>for all delays related thereto</u>...and for <u>performance of the change within the time frame stated</u>.

(*Id.* at 4-5) (Emphasis added)

34. Although MOQA did not request any more time in its proposal, the Corps had estimated that the work would take an additional 60 days (*e.g.*, ex. G-16 at 5). However, because MOQA did not request more time, the Corps did not have Michael Baker Jr.,

8

Inc., perform an analysis to determine the time impact (tr. 3/38-39, 96). Dickson Boadi, the Corps' office engineer who negotiated the modification, was not surprised that MOQA did not ask for more time. He had negotiated differing site conditions modifications in the past with contractors who did not ask for more time, and, because the parties had just negotiated the 92-day extension for Mod. A00003 (R4, tab 11), he figured that the delays were concurrent (tr. 2/316-21).

### d. The 65, 90 and 100% Designs

35. The contract required MOQA to submit a 65% design that presented all information necessary to "Site Adapt" the fully designed and detailed buildings and other project features (R4, tab 7 at 193). MOQA initially submitted this design on 9 April 2011, which was about 12 weeks after the Corps had approved the 10% design, making it 10 weeks late (R4, tab 155 at 2).

36. Despite its submission of the 65% design in April 2011, MOQA contends that the pending RFPs for the compound size change and collapsible soils prevented MOQA from working on the 65% design until the parties signed these modifications in May 2011 (e.g., app. br. at 32; app. reply at 8). MOQA has not provided us with any testimony from its designers or an expert that would explain a contention that seems to be refuted by its submission of the 65% design prior to execution of these modifications.

37. In any event, the Corps found MOQA's initial 65% submittal to be lacking, with one of its engineers writing that MOQA had: omitted the design analysis, geotechnical analysis, site utility design, and survey/topographic map; that the septic tank and foundation designs were incorrect; and that MOQA had modified some of the site-adapt designs without explanation. He concluded that the "submittal does not represent a 65% design submittal." (R4, tab 397) The Corps returned the submittal to MOQA with a "C" code on 27 April 2011 (R4, tab 155 at 2). MOQA resubmitted the 65% design on 2 June 2011, and the Corps approved it with a "B" code on 18 June 2011 (id.).

38. MOQA did not submit the 90% design until 3 October 2011, about three months late (R4, tab 155 at 2). MOQA contends in its reply brief that it submitted the 90% design on 29 August 2011, which would have been nearly two months late (app. reply at 9). However, MOQA did not record any such submission in the submittal register; it does not appear in the government's Rule 4 file; and MOQA has not pointed us to any other evidence of its submission, such as a discussion at a weekly meeting. Thus, we conclude that MOQA submitted the 90% design on 3 October.

39. The Corps rejected the 90% design with an "E" code on 17 October 2011 (R4, tab 155 at 2). MOQA did not contest the rejection and sent its designer a cure notice on 25 October 2011 (R4, tab 269 at 6). MOQA did not resubmit the 90% design

9

before termination on 31 October 2011. Nor did it ever submit a 100% design. (*See* R4, tab 155 at 2)

D.    Schedules

40. Contract section 01321 set forth 12 pages of requirements concerning project schedules (R4, tab 7 at 179-90). Paragraph 3.1, General Requirements, provided that scheduling of design and construction was MOQA's responsibility. It provided that the approved project schedule would be used to measure progress of the work, to aid in evaluating time extensions, and to provide the basis of all progress payments. (*Id.* at 179) Paragraph 3.2, Basis for Payment, provided that the lack of an approved schedule would result in an "inability of the Contracting Officer to evaluate Contractor's progress for the purposes of payment." Similarly, it provided that MOQA's failure to provide all information required in section 01321 would result in disapproval of the schedule and an inability of the contracting officer to evaluate progress for payment purposes. (*Id.*)

41. The contract required MOQA to include a narrative report with the preliminary schedule as well as all updates. The narrative was to include a description of activities along the two most critical paths, a description of current and anticipated problem areas or delaying factors and their impact, and an explanation of corrective actions taken or required to be taken. (R4, tab 7 at 185) MOQA failed to include this narrative with most of the schedules it submitted.

42. The contract required MOQA to submit the initial project schedule (referred to as a baseline schedule) within 30 days of contract award (R4, tab 7 at 184). As described above, the Corps awarded the contract on 5 May 2010. Twenty-two days elapsed before the Corps suspended work on 27 May 2010. MOQA thus had eight days from the resumption of work on 26 August 2010 to submit the schedule, that is, until 2 September 2010. MOQA did not meet this date, or even a date 30 days from the lifting of the suspension, rather it submitted the baseline schedule on 18 December 2010, more than three months late. The Corps approved it with a "B" code the following day even though MOQA failed to include the required narrative. (R4, tabs 47, 155, 300)

43. The approved project schedule showed a completion date of 10 October 2011, which was past the then-contract date of 22 August 2011 (*see* R4, tab 10 at 2). A late completion such as this is referred to as "negative float" (R4, tab 7 at 182-83). It is not entirely clear why MOQA showed late completion at this relatively early juncture, but the major reason is that MOQA listed the license for construction work stoppage as ending on 20 September 2010 rather than the correct date of 25 August 2010, an addition of 26 days (R4, tab 47, tab 213 at 6).

44. The contract required MOQA to submit periodic schedule updates to enable the contracting officer to assess its progress. If MOQA failed to furnish the schedule data

that the contracting officer determined was necessary to verify its progress, MOQA would be deemed to have not provided an estimate upon which a progress payment could be made. (R4, tab 7 at 184) The submittal register indicates that MOQA submitted schedule updates on 30 June 2011 (rejected with an "E" code), 24 September 2011 ("E" coded on 29 September), and on 24 October 2011, which the Corps did not return before termination (R4, tab 155). MOQA also submitted revised baseline schedules on 27 September 2011 ("E" coded on 29 September) and 24 October 2011 (*id.*).

45. Moving beyond the QCS/RMS submittal register, the record also indicates (and USACE agrees (gov't reply at 27-28)) that MOQA submitted other schedules by email. Thus, it appears to have submitted a schedule update (without the narrative) in the 17-20 June 2011 timeframe (R4, tabs 473, 496-97); on 9 August 2011 (without the narrative) (R4, tabs 479, 491, 495); on 28 August 2011 (R4, tab 307 (this tab contains a transmittal form but not the schedule)); and two in October 2011 (R4, tabs 303, 490) (without the narrative). The Corps did not approve any of these updates.

E.    Other Submittals

    i.    Area Use Plan

46. The contract required MOQA to submit within 10 days of award an area use plan that designated its intended use of all areas in the project site. The contract provided that MOQA could not "begin construction of the mobilization facilities" before the contracting officer approved the area use plan (R4, tab 7 at 149), which would bar it from mobilizing and beginning construction. Based on an award date of 5 May 2010 (R4, tab 7 at 1, tab 15), the area use plan was due on 15 May 2010, or 12 days before the Corps suspended work because of the license for construction.

47. MOQA's president, Mr. Hamidi, testified that he viewed the area use plan as "not a big deal" but he agreed that the contract required it before MOQA could start working on the site (tr. 7/16-20). Mr. Hamidi also testified that he understood the area use plan to be due 10 days after the notice to proceed (*id.*). While this is not what the contract says, taking into account a 20 May 2010 notice to proceed and the time that passed before the contracting officer suspended work on 27 May, the area use plan would still have been due before the end of August 2010. The record indicates, however, that MOQA did not submit the area use plan until 20 March 2011 (R4, tab 155 at 1), more than six months late under MOQA's more lenient calculation of the due date.

48. MOQA contends in its brief that it submitted the area use plan on 29 June 2010 (app. br. at 29 (citing R4, tab 288 at 10)) but the weight of the evidence supports the Corps' position. First, MOQA never entered a 29 June plan in the submittal register (R4, tab 155), which we consider the best evidence of submittal dates. Second, when the contracting officer's representative wrote to MOQA on 16 March 2011 citing

11

MOQA's failure to submit the plan (R4, tab 63), MOQA did not reply that it had submitted the plan. Rather, it submitted the plan reflected in the submittal register. Third, in his testimony, Mr. Hamidi agreed that MOQA did not submit this plan until 20 March 2011 (tr. 7/18).

### ii. Right of Entry Coordinate Data

49. The contract required MOQA to submit to the contracting officer's representative (COR) as a preconstruction submittal right of entry coordinate data (R4, tab 7 at 36, 40). The submittal was to contain an exhibit illustrating the limits, boundaries, and coordinates representing the right of entry, among other things (*id.*). MOQA did not submit this data until 5 July 2011; the Corps rejected it with an "E" code on 9 July 2011 (R4, tab 155 at 1); MOQA never re-submitted it. In its reply brief, MOQA states that the government "failed to recognize that the coordinate data included within the Contract was incorrect," which may be true, but presumably that was why the government wanted it confirmed (app. reply at 3 (citing R4, tab 7 at 40)). MOQA does not explain why it never resubmitted this information.

### iii. Master Site Plan

50. The contract required MOQA to submit a master site plan within 20 days of the notice to proceed (R4, tab 7 at 42). Taking into account the suspension of work due to the license for construction, this submittal was due in early September 2010. During his testimony, Mr. Hamidi testified that this submittal was "not a big deal." (Tr. 7/51) MOQA did not submit it until 30 June 2011; the Corps approved it with a "B" code five days later (R4, tab 155 at 1). MOQA does not address this in its reply brief other than to contend that it did not delay the critical path (app. reply at 3).

### iv. Quality Control Plan and Accident Prevention Plan

51. The contract provided that MOQA was responsible for quality control (QC or CQC[3]) and for establishing and maintaining an effective quality control system (R4, tab 7 at 238). It required MOQA to submit a QC plan that covered all construction operations, both on site and off site, including work by subcontractors, fabricators, suppliers and purchasing agents.

52. The contract required a CQC organization including a CQC system manager who was to be present at the site at all times (R4, tab 7 at 239). The contract provided that, when it became necessary to make changes to the CQC organization, MOQA was to revise the CQC plan to reflect the changes and submit it to the contracting officer for approval

---

[3] Contractor Quality Control.

(R4, tab 7 at 242-43). In its QC plan, MOQA stated that its organization included a CQC manager, a safety and health manager, and a site superintendent (R4, tab 35 at 13).

53. MOQA was to submit the plan by no later than five days after receipt of the notice to proceed (R4, tab 7 at 239), meaning that it was due in May 2010, but MOQA did not submit it until 23 October 2010 (R4, tab 155 at 2, tab 35). The Corps approved it the same day (*id.*).

54. The contract also required MOQA to submit an accident prevention plan (APP) (R4, tab 7 at 255). MOQA submitted the APP on 29 November 2010 (R4, tab 155 at 2). The Corps gave it a "C" code (resubmission required) on 14 December 2010; MOQA resubmitted it 44 days later (27 January 2011), receiving approval (an "A" code) the same day (*id.*).

55. The APP was to include, among other things, the names and qualifications of all site safety and health personnel designated to perform work on the project, including the designated site safety and health officer (SSHO) and other competent and qualified personnel (R4, tab 7 at 256). The contract required an SSHO to be present at the site at all times to perform safety and occupational health management, surveillance, inspections, and safety enforcement for MOQA (*id.* at 253). The contract provided that disregarding provisions of the contract or APP would be cause for the contracting officer to stop work (*id.* at 256).

56. MOQA's APP did not identify an SSHO, but it identified Asif Dashty as performing the role of safety and health manager/chief safety engineer (R4, tab 56 at 13). The record indicates that both parties understood Mr. Dashty to be the SSHO (*see* R4, tab 117 at 8; gov't br. at 15 n.13). Mr. Dashty had also been identified as the safety and health manager in the CQC plan (R4, tab 35 at 13).

57. During the course of the project there were disputes between the parties concerning MOQA's safety practices and its CQC and safety personnel. For example, on 18 June 2011, Chester Lawrence, the USACE quality assurance representative, wrote to MOQA stating that "[s]afety is bad" on the site (R4, tab 88). And on 27 June 2011, after Mr. Lawrence received photos from the site that showed that MOQA's safety manager/SSHO was allowing men to work without hard hats, safety glasses, vests, and proper footwear, he warned MOQA that this could lead to his removal from the project and the Corps shutting down the site (R4, tab 94; tr. 2/89-92).

58. On 27 April 2011, the COR, Kevin Gatlin, notified MOQA that MOQA's recent QC reports indicated that it did not have a CQC manager on site (R4, tab 71). On 3 May 2011 the parties met for a bi-weekly progress meeting at which the Corps representatives met a new MOQA CQC manager and new safety manager who had not been submitted to the Corps for approval (R4, tab 73 at 2, 4). On 16 May 2011 MOQA emailed resumes for

the new personnel, including the safety manager, Muhammad Asif Mashal (R4, tab 75 at 6). Upon review, COR Gatlin became concerned because Mr. Mashal was very young and his only listed experience was as a high school teacher (tr. 4/261-62).

59. The Corps requested MOQA update its personnel (tr. 4/262), which MOQA did, but not until August 2011 (R4, tab 117). The update included new information for Mr. Mashal. The new information was even more troubling to COR Gatlin because it indicated that he had graduated from college in 1996, which was curious because his resume indicated that he had been born in 1987 (*compare* R4, tab 75 at 6 and tab 117 at 23). Upon further review, COR Gatlin concluded that MOQA had simply taken the education and work history for the previous safety and health manager and pasted it under Mr. Mashal's name in the update (tr. 4/264).

60. COR Gatlin wrote to MOQA on 16 August 2011, stating "[i]t appears that your office was trying to give the impression that Mr. Mashal was qualified for the position of SSHO when it is clear by his resume that he does not meet the minimal requirements to be in this position" (R4, tab 126). He directed MOQA to submit a qualified candidate for approval and stated that until MOQA had an approved SSHO it was not allowed to do any work on the site (*id.*; *see* R4, tab 7 at 253). By this point in time, Mr. Mashal had been acting as the SSHO on the site for more than four months (including the period in June described above in which the LNQA photographed workers without hard hats, safety glasses, etc.). Work at the site stopped for 18 days while MOQA retained and gained approval of a new SSHO (R4, tab 183 at 899-925).

61. Mr. Hamidi (MOQA's president) wrote back the following day (17 August), admitting that the company had submitted "wrong information." He stated that the person responsible had been "dismissed" and no longer worked for MOQA and that MOQA would submit a new SSHO. (R4, tab 127)

62. On 18 August 2011, Mr. Hamidi submitted to COR Gatlin names and resumes for new personnel, including an SSHO (R4, tab 129). Unfortunately for MOQA, COR Gatlin was aware that the USACE safety office had previously rejected this person on another project. Even worse for MOQA, when COR Gatlin compared the information submitted with the resume on file, it appeared the MOQA had again falsified his background. (Tr. 4/272-75, 284-85; *compare* R4, tab 129 at 4-6 and 7-8)

63. COR Gatlin wrote to MOQA on 23 August 2011, stating in relevant part that "your office was trying to give the appearance that Mr. Faryad was qualified for the position of Site Safety and Health Officer when it is clear by his Résumé that he is not. This is the second time the government has notified your office of providing such information." (R4, tab 133) There does not appear to be any document in the record where MOQA denied this charge (*see* R4, tab 139 (contracting officer's letter dated

21 September 2011 noting lack of response to 23 August letter)). On 23 August, the Corps also rejected the updated safety personnel with an "E" code (R4, tab 155 at 2).

F.    MOQA's REA

64. On 4 June 2011, MOQA submitted a request for equitable adjustment seeking additional time and money for a variety of reasons. Although short on specifics, the REA sought among other things:  additional money for the license for construction delay (not mentioning the bilateral modification it had signed); additional time from 4 September to December 2010 for "submittals of 65% Design, scheduling and additional paper work of the contract" (even though it did not submit the 65% design during this period); and adverse weather from December 2010 to March 2011 (despite the lack of an approved design necessary to start work). (R4, tab 82) The contracting officer denied the REA on 20 June 2011 (R4, tab 89).

III.    The Local National Quality Assurance Representative (LNQA)

65. MOQA attributes many of its problems to the LNQA, Habibullah Khadaam. It has produced an employment record reflecting that it hired Mr. Khadaam to be a QC manager on a different MOQA contract on 27 January 2011 (R4, tab 456). Mr. Hamidi testified that he soon terminated Mr. Khadaam because Mr. Khadaam wanted to work in the office rather than at the job site (tr. 6/240). Mr. Khadaam began working on the instant contract – on site – in early April 2011 (R4, tabs 68, 182 at 322). MOQA did not protest Mr. Khadaam's presence at the site.

66. The closest we have come to finding a MOQA complaint about Mr. Khadaam in his first months on the project occurred on 18 June 2011 when the USACE quality assurance representative, Chester Lawrence, emailed MOQA about several safety and quality issues. MOQA did not deny that any of the problems existed but it asked the Corps to instruct Mr. Khadaam that he was part of a "team" and should try to work out issues with MOQA before bringing them to the attention of the Corps. (R4, tab 88 at 1)

67. Mr. Lawrence testified that he did not see anything that indicated Mr. Khadaam was biased or unduly harsh towards MOQA or that he was putting inaccurate information in the daily reports. He testified that he did not receive any complaints by MOQA about Mr. Khadaam during the first four months he was on the project. He testified, that he "probably would have instructed him [Mr. Khadaam] to be a little bit more critical." (Tr. 2/82-83) He further testified that he observed Mr. Khadaam interact with MOQA employees in a friendly manner, that they drove from the site to the meetings together, ate lunch together and talked together (id.). We found this testimony credible.

68. On the morning of 11 August 2011, Mr. Khadaam emailed Mr. Lawrence his daily report for the previous day; he stated in the email that the report was late because

15

MOQA did not have constant electricity on site (R4, tab 403 at 2). Mr. Lawrence then wrote to MOQA stating "please get your electrical person submitted and approved or work will stop at this site due to non-compliance with no power on site for trailers, office, restrooms, living conditions, etc. this has been ongoing" (*id.*). Mr. Lawrence also stated MOQA was in violation of the contract by not having an SSHO on site (*id.*).

69. Mr. Hamidi responded later that day and did not deny that Mr. Khadaam had accurately reported the electrical problem. However, he stated, in part: "Your representative specifically on dashte-qala site is not cooperating and playing almost negative role. He is not working as a team member."[4] (R4, tab 403 at 1) Although he did not mention Mr. Khadaam by name, it is undisputed that he was referring to Mr. Khadaam. Shortly thereafter, the parties held a conference call in which MOQA alleged for the first time that Mr. Khadaam was a former MOQA employee who was upset about being fired and was causing problems at the site (tr. 4/241-42). The Corps then agreed to switch Mr. Khadaam to another project (ex. G-10).

70. Musadiq Sadiqi replaced Mr. Khadaam as the LNQA (R4, tab 182 at 559). Almost immediately, he caught MOQA attempting to substitute UPVC pipe for PVC pipe for the water well casing (R4, tab 128). (PVC is polyvinyl chloride; UPVC is unplasticized PVC (tr. 4/320; R4, tab 7 at 67).) MOQA had previously submitted the UPVC but the Corps had rejected it because "it doesn't hold up for stuff like well casings" (tr. 4/321; R4, tab 502 at 1132-33). Mr. Sadiqi caught MOQA scratching or shaving the "U" off "UPVC" (R4, tab 128).

71. Both Mr. Lawrence and COR Gatlin testified that the daily reports about MOQA's performance were similar after the Corps ordered Mr. Khadaam's transfer (tr. 2/189, 278, 4/254-55). For example, after the shutdown ended due to the lack of a MOQA safety officer, the 6 September 2011 quality assurance report notes that a MOQA supervisor was "not professional," that rebar on a guard tower was rusty and unacceptable, and that the guards who were supposed to be providing security per MOQA's security plan had left "months ago" (R4, tab 182 at 596). On 13 September the quality assurance report states that the MOQA QC manager "is not qualified to QC not understand the Corps work procedure and QC definition what WC mean [sic]." It also stated that this same employee was performing survey but was "not qualified to survey." It further noted that when quality assurance found a deficiency at the site there was no one at MOQA to talk to because the QC manager was busy with the surveying. (*Id.* at 606) On 19 September 2011 the quality assurance report identifies several problems with the concrete, rebar, compaction, and the survey and the lack of a surveyor on site (*id.* at 616).

---

[4] In this email, Mr. Hamidi also complained that the paperwork required by the contract was "extremely high" and stated that MOQA was still having a problem with it even though it had hired three U.S. citizens to work on USACE projects.

72. When the Corps interviewed Mr. Khadaam's supervisor, he denied that Mr. Khadaam had done anything wrong (tr. 2/104). In fact, Mr. Khadaam had never been the sole source of information for the Corps, which had been receiving similar information from the other local nationals (tr. 4/243-45). On 29 September 2011, having found no basis for the allegations against him, the Corps allowed Mr. Khadaam to report back to the job site (R4, tab 411; tr. 1/194).

73. At the hearing, MOQA's counsel floated a theory that reports from the local nationals stayed negative after Mr. Khadaam's departure because they were all from the same tribe (tr. 2/237). In its post-hearing brief, however, MOQA has settled on a theory that Mr. Khadaam never really left the site (app. br. at 92). Otherwise, MOQA has little to say about the actions of Mr. Sadiqi or the other local nationals. We find that there is no evidence to support the contention that Mr. Khadaam stayed on the site. The Corps had transferred him to another site that was some hours away and surely would have noticed if he had not reported to that site. (R4, tab 411; ex. G-10)

74. MOQA's first written salvo against Mr. Khadaam did not occur until the Corps issued its final performance evaluation for MOQA (post-termination) on 1 February 2012 (R4, tab 224). In the "contractor remarks" section of the evaluation, MOQA contended that Mr. Khadaam had been dismissed from MOQA for "unsatisfactory performance" and that he had "extreme revulsion" against MOQA and that "[d]ue to his revenge and provocation" a conflict had occurred between MOQA and its subcontractor, Amiry Brothers (id. at 3).

75. MOQA makes an assortment of other allegations against Mr. Khadaam, including that he was: interfering with MOQA's work; submitting biased reports; committing extortion; soliciting bribes; that he had "plants" who would apply for jobs at MOQA and, after they were hired, he would declare them to be unqualified; and that he turned MOQA's main subcontractor, Amiry Brothers, against MOQA (app. br. at 36, 39; tr. 5/362).

76. With respect to Amiry Brothers, the 13 August 2011 daily report that Mr. Khadaam sent to the USACE quality assurance representative, Mr. Lawrence, noted that there had been a conflict and quarrel between MOQA and an unnamed subcontractor "because of invoice payment & some other illogical reasons" (R4, tab 123 at 3). This report further states that the subcontractor had expended $130,000 but had not been paid and was not going to work anymore (id. at 7-8). On 8 October 2011, MOQA notified the new USACE COR, Theodore Champine, that it (MOQA) had terminated Amiry Brothers' subcontract "because he couldn't follow the contract" (R4, tab 145). On 23 October 2011, Amiry Brothers sent an email to Mr. Lawrence complaining about nonpayment (R4, tab 150).

77. Amiry Brothers shifted its position somewhat on 17 December 2011 – about six weeks after the Corps terminated MOQA – when it sent another email to Mr. Lawrence stating that it had sent the 23 October email "unfortunately by mistake," and that it had been paid by MOQA (R4, tab 440). Notably, it did not make any allegations against Mr. Khadaam.

78. More than five years later (25 December 2016), virtually on the eve of trial, MOQA filed as a Rule 4 supplement a letter from Amiry Brothers that told a remarkably different story. A company official now alleged that Mr. Khadaam "had serious issues with MOQA" and that he had "managed to provoke our company against" MOQA (R4, tab 489). He alleged that Mr. Khadaam had "encouraged our on-site employees to act against MOQA" and had "even made my brother to send an official e-mail complaining against MOQA[] and claiming that we are not getting our payments on time whereas we used to receive regular payments" (*id.*). He further alleged that Mr. Khadaam had promised Amiry Brothers that if they caused MOQA's termination, he would re-award the contract to Amiry Brothers based on his strong ties with the Kunduz resident office (*id.*).

79. We find the 25 December 2016 Amiry Brothers letter to be completely incredible because it is inconsistent with its contemporaneous statements during the project and raises allegations for the first time more than five years after the fact. Nor do we believe any of MOQA's other unsubstantiated allegations against Mr. Khadaam, who is a virtual Swiss Army knife of a villain for MOQA to explain poor quality work, safety lapses, subcontractor complaints of nonpayment, and the submission of falsified resumes. It is simply too much for us to swallow.

80. If Mr. Khadaam really had reason to be disgruntled with MOQA we believe it to be more likely than not that MOQA would have complained about him to the Corps either right when he started or at least when there was the first sign of retaliation. To accept Amiry Brothers' new allegations as true, we would have to disregard not only its contemporaneous statements but the credible testimony of Corps employees who: observed amicable relations between Mr. Khadaam employees; received similar reports from Mr. Khadaam's superiors and his replacement, and who were in a position to observe MOQA's general ineptness with respect to both the design and construction of the project.

IV. Progress of Construction: March to October 2011

A. March to May

81. As described above, the contract generally barred MOQA from beginning construction until the Corps had approved the design, although it did provide that the Corps could grant a clearance for construction for foundation and other work after approval of the 65% design (R4, tab 7 at 32). Notwithstanding these provisions, on

28 March 2011 (before MOQA had even submitted the 65% design), COR Gatlin issued a clearance for construction, but only for grubbing clearance and grading at the site (R4, tab 66). This was the only clearance that the Corps ever issued and the contract provided that any work MOQA did without a clearance for construction was at its own risk and expense (R4, tab 7 at 222).

82. As the design process dragged on, the Corps demanded that MOQA submit recovery schedules to show how it would catch up and complete the work on time. In a letter of concern dated 8 May 2011, the COR demanded that MOQA submit a recovery schedule by 17 May 2011 (R4, tab 74). MOQA did not meet that deadline but on 31 May 2011 it submitted what it referred to as a recovery plan, which showed a project completion date of 4 January 2012 (R4, tab 470).

B.    28 June to 1 October:  Foundation Work

83. The parties agree that the concrete block building at issue can be constructed quickly, at least if competent personnel and sufficient resources are applied. For example, MOQA points us to the following testimony from the Office Engineer, Dickson Boadi:

> Q. Was the building a complex building?
>
> A. No. It's not a complex building. It's a simple CMU [concrete masonry unit] block structure....
>
> And that structure, if you have your foundation down, within a week or two you can have all your block work up. It's, I'm not kidding you. Within a week or two there are masons onsite, they can erect all the block work up and you can have your roof up in no time.

(Tr. 2/320)

84. MOQA started the foundation work on the headquarters building on 28 June 2011 (R4, tab 182 at 441, tab 213 at 12; app. reply br. at 11). According to MOQA's original schedule, it had planned on performing this work from 7 January to 9 February 2011, a duration of 34 days (R4, tab 47 at 1, lines 27-33). Thirty-four days from the actual start date of 28 June projected to a completion of the foundation on 31 July 2011. The parties agree that MOQA did not complete the foundation until 1 October 2011 (gov't br. at 29; app. br. at 68), which represents a delay of more than two months. There are multiple reasons for this delay, all of which are MOQA's responsibility, including insufficient workers and equipment (*e.g.*, R4, tab 182 at 463, 491-92), and the shutdown from 16 August to 4 September 2011 due to the lack of an SSHO, as described above.

85. Further, MOQA attempted to skip the submission of a borrow source for the fill. On 11 July 2011, COR Gatlin wrote to MOQA stating that it had come to his attention that MOQA had been placing unapproved backfill in the over-excavated areas, despite the requirement in Mod. P00003 that the borrow source be approved by the COR (R4, tab 109 (citing tab 12 at 4)). COR Gatlin directed MOQA to submit the borrow source in the next two days and to not place any more material until it had been approved (*id.*). According to the submittal register, MOQA did not furnish the submittal until 18 July; the Corps rejected it four days later (R4, tab 155 at 4). MOQA resubmitted it but the end result was that MOQA did not have an approved borrow site until 11 August 2011 (*id.*).

## C.    LNQA Khadaam's Alleged Delays

86. MOQA does not have much to say in response to the delays in the summer of 2011, other than making additional allegations against Mr. Khadaam. It contends Mr. Khadaam not only required MOQA to lab test material at the borrow site, but also to have a lab at the project site to test it again (app. br. at 35). MOQA cites Rule 4, tab 182 at pages 416-21, which are the quality assurance reports for 15-18 June 2011. It does not identify the precise language it is relying upon but presumably it is a statement that "[t]he contractor didn't provide any lab technician in the site yet & the lab technician is necessary to be in the site in these days." (*Id.* at 416) From looking at this in context, we do not see anything improper.

87. As described above, the parties executed bilateral Mod. P00003 on 28 May 2011 to remediate the collapsible soils (R4, tab 12). The modification required MOQA to submit the borrow source for the fill to the COR for approval, specified the acceptable types of soil that could be used and prescribed limits for compaction density, moisture content, and the height of lift layers. It also specifically provided for classification of the materials when brought on site. (*Id.* at 4) Thus, the contract clearly required some on-site testing of the borrow material to ensure that it was the proper type, density, moisture and lift height.

88. If MOQA's contention were correct – that Mr. Khadaam required double testing of the fill as another form of revenge for being fired – we would expect to see some documentation in the record complaining about this, but MOQA has not produced any. There is no evidence that the government required more testing of the soil than required by the contract.

89. Finally, we would be remiss if we did not also observe that the quality assurance reports MOQA directed us to in support of its contentions on this issue contain unflattering statements about its overall performance of the contract. The reports for the 15-19 June 2011 time period state, among other things:

20

- The security manager is not experienced & he doesn't know even one word about security issues, actually he is the finance officer of this project for MOQA, but MOQA is using him as a security manager too;

- The security manager is using his four guards as labor[er]s inside the construction site;

- The coars[e] aggregate particles are round and [are] not fit to use in concrete or mortar;

- The stones for masonry wall are not mountain stones and they seem poor strength;

- [We] don't have surveyor on site because of the QC manager's absent & the PM finished the walls excavation without having any direction of surveyor or knowing of the finished grade;

- [T]he electricity system for temporary facility installed improperly (No grounding, No main panel board);

- [T]oilets are unusable because of not installing water tank & septic.

(R4, tab 182 at 416-23)

D.    July to October:  Final Efforts to Get MOQA on Schedule

90.  With performance of the work continuing to lag, on 5 July 2011, COR Gatlin demanded MOQA submit another recovery schedule by 20 July 2011 because the approved baseline schedule and MOQA's most recent update showed a negative float of 43 days.  He stated that the recovery schedule must show a number of activities on the critical path that would be accomplished in the next 90 days and that the recovery schedule must show how MOQA would employ additional resources to reduce the negative float.  (R4, tab 101)  On 30 July 2011, COR Gatlin wrote to MOQA, stating that MOQA had submitted a schedule on 21 July 2011 but it did not meet the requirements for a recovery schedule because it did not contain a narrative explaining

21

how additional resources would be used to reduce the negative float; he requested MOQA provide the information immediately (R4, tab 116).

91. On 30 July 2011, MOQA submitted another 90-day recovery schedule (R4, tab 477). MOQA stated that it would add a second shift as soon as the status of its submittals allowed and stated that it would be submitting a night shift safety plan (*id.* at 3). (This is the only schedule we have seen that includes the required narrative.) MOQA did not submit anything on the night shift and on 21 August 2011 COR Gatlin wrote to MOQA reminding it that it must submit night personnel for approval and must submit a lighting plan (R4, tab 480 at 18 (citing R4, tab 7 at 155)).

92. On 9 August 2011, MOQA submitted a schedule update that the Corps forwarded to Michael Baker Jr., Inc., for review (R4, tab 495). The Michael Baker reviewer observed that the schedule showed MOQA having completed 52% of the work while the RMS system showed only 31%. He recommended acceptance only if work placement for the months of June and July matched what MOQA had indicated in the schedule and MOQA was working seven days per week. (*Id.* at 1) Notably, MOQA represented in the schedule that it had completed nearly one-third of all project work in July (*id.* at 8), which is not credible because it did not even have an approved borrow source and because its work hours trended down for most of the month (*compare* R4, tab 183 at 804 (380 combined work hours for MOQA and Amiry Bros. on 1 July 2011), at 816 (349 hours on 7 July), at 830 (226 hours on 14 July), at 844 (198 hours on 21 July), and at 858 (204 hours on 30 July)). COR Gatlin wrote to MOQA on 21 August 2011 stating that the June and July progress had not occurred and that the schedule was, therefore, unrealistic and was rejected (R4, tab 302).

93. On 23 August 2011, COR Gatlin sent MOQA another letter of concern. In this letter, COR Gatlin stated that, based on a contract completion date of 22 November 2011, MOQA should be 92% complete but the Corps estimated its progress at 20%. COR Gatlin demanded that MOQA submit a recovery schedule by 30 August 2011. (R4, tab 133)

94. On 21 September 2011, the contracting officer sent MOQA a cure notice in which he stated that MOQA had not responded to the 23 August letter of concern or provided an updated recovery schedule (R4, tab 139). The contracting officer stated that it no longer appeared possible for MOQA to complete the project on time. The contracting officer demanded that MOQA cure the condition within 10 days or he would consider terminating the contract for default.

95. MOQA responded with a letter dated 30 September 2011 (R4, tab 141). It acknowledged its "lack of progress" and expressed a "sincere desire and intent to complete the project as well as improve our performance." Further, it stated that "[i]n response to our deficiencies, we have...completely reorganized our management and

processes." It stated that it was working to complete a 90-day recovery plan that it would complete in 7 to 10 days. (*Id.* at 1) MOQA did not dispute that its progress was at 20%, nor did it contend that it was entitled to additional time.

96. In its response to the cure notice, MOQA also recognized that it must work at night and add workers to the project. It stated that it was developing a "Night Work and Lighting Plan...for approval for the night work to commence. (R4, tab 141 at 2) As late as 19 October 2011, MOQA stated that it intended to submit a night work safety plan (R4, tab 442 at 3), but it failed to do so before termination (tr. 1/90, 136).

97. Conditions on the project did not improve in October. At a meeting on 4 October 2011, COR Champine, asked MOQA's project manager when it would achieve "real completion" of the project. He replied that if there were no problems with submittals, drawings, and construction supplies MOQA would complete the project in seven months, or about five months late. (R4, tab 144 at 2-3)

98. Within four days something did go wrong, because MOQA terminated Amiry Brothers (R4, tab 145). Termination of Amiry was a significant problem because Amiry was responsible for most of the actual work on the site (*see* R4, tab 78 at 3 (identifying Amiry's scope of work as all civil, structural, architectural, electrical, and mechanical work)). And something else went wrong on 17 October 2011 when, as described above, the Corps rejected MOQA's 90% design (R4, tab 155 at 2). Then, on 23 October 2011, Amiry Brothers complained to USACE that it had not been paid by MOQA (R4, tab 150). Further, on 27 October 2011, Michael Baker recommended rejection of MOQA's 19 October schedule update because MOQA had "unreasonably shortened activity durations in an effort to forecast a compliant project completion date and not [sic] doubt to facilitate payment exceeding 50% of the contract value" (R4, tab 493).

## V. Termination for Default and the Aftermath

99. On 31 October 2011, the contracting officer, Willie R. Brame, terminated MOQA's contract for default (R4, tab 4). As stated by CO Brame in the termination letter, the contract incorporated FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) (R4, tab 7 at 5). As reasons for the termination, CO Brame stated: 1) that MOQA had failed to prosecute the work with sufficient diligence to complete the project on time, having completed only 30% of the work while using up 527 of the 549 days in the contract term; 2) MOQA failed to provide an adequate Accident Prevention Plan; and 3) MOQA repeatedly failed to establish and implement an adequate Quality Control Program (R4, tab 4 at 1).

100. On 1 November 2011, COR Champine directed MOQA to demobilize from the site and remove any equipment and any stockpiled materials for which it had not

been paid (R4, tab 365 at 184). On 3 November 2011, COR Champine sent the LNQA (Mr. Khadaam), the local national deputy resident engineer (Mr. Seddiq), and the local national project engineer (Mr. Fardin) to the site to determine the level of completion MOQA had achieved (tr. 1/113; R4, tab 182 at 714). COR Champine relied on this information to calculate the final payment due MOQA (tr. 1/114, 134-37). COR Champine, with assistance from Mr. Lawrence, calculated that MOQA was entitled to $642,840.63, or about 25% of the contract price of $2,572,449.11 (R4, tab 181; tr. 1/230). (Mr. Lawrence testified that he disagreed. He concluded based on the amount of defective work that had to be removed by the replacement contractor that MOQA had completed only 20% (tr. 2/71).)

101. In any event, COR Champine performed this analysis by reviewing the cost loaded subCLINs in the RMS system, comparing it with the site assessment by the local nationals and cross referencing it with installed materials that were approved and accepted (tr. 1/233-34). Taking into consideration previous payments, COR Champine concluded that MOQA was entitled to a final payment of $123,398.63 plus release of $25,375 in retainage (id.; ex. G-5). The contracting officer approved the payment on 7 February 2012 (R4, tab 181).

102. Notwithstanding the termination and COR Champine's 1 November 2011 direction to vacate the site, MOQA was unwilling to leave, assigning guards to the site and causing some concern about an armed standoff (R4, tab 419 at 1-9). MOQA wrote to the Corps on 7 February 2012 asserting its "right to maintain security of their financial holdings being the jobsite and any/all materials" (R4, tab 3). On 22 March 2012, MOQA again wrote to the Corps, stating that it was maintaining "site security" to protect its "vested interest" and alluded to the possibility of "civil unrest in the village" if the Corps did not allow MOQA to resume work (R4, tab 162).

103. The Corps awarded a contract to Bamic Global Construction Company on 29 February 2012 to complete the project (R4, tab 184). Bamic's scope of work included removal of MOQA's foundation for the headquarters building, the perimeter wall and foundation, and the guard tower support columns (R4, tab 418 at 78, tab 459 at 50).

104. The 12 April 2012 quality assurance report for the replacement contractor states that the following materials and equipment belonging to MOQA were still on the site: "Cement, steel re bar, forms, scaffolding pipe, stone, sand, gravel, wheelbarrow, shovels and etc." (R4, tab 459 at 2). Although somewhat difficult to tell because text in the reports was carried forward unnecessarily from day to day, MOQA appears to have removed everything but the sand, gravel, and stones by 22 April 2012 (id. at 22).

105. The Corps terminated Bamic for default on 10 November 2013 for failing to complete the work by the required completion date (R4, tab 202). A third contractor finally completed the project in April 2015 (R4, tab 211).

## VI. Claims and Appeals

106. On 24 January 2012, MOQA timely appealed the termination for default. The Board assigned the appeal ASBCA No. 57963.

107. On 1 December 2015 MOQA submitted a certified claim (R4, tab 177). Referencing ASBCA No. 57963, MOQA contended that the termination should be changed to one for the convenience of the government. It sought $1,864,660.45, which included $624,740.00 for materials left on site; $227,915.00 for "construction and machinery" left on site; $842,587.23 for unpaid pay requests up through the date of termination; and $169,418.22 for consulting fees paid to Kevin Cato (*id.* at 1-2).

108. There is no question that MOQA left materials on site (R4, tab 177 at 4). However, as Mr. Lawrence, the USACE quality assurance representative testified, "[w]e only pay for stuff that's approved and submitted. And if it's brought onsite and used in deficient work, we don't pay for that either." (Tr. 2/37) This presents obstacles to MOQA's claim. For example, the second largest item on the list of materials is steel reinforcement (rebar), which MOQA never submitted for approval (tr. 2/51; R4, tab 155 at 2).

109. The largest item on MOQA's materials list is $322,910 for "gravel (crash)" (R4, tab 177 at 4). MOQA had an approved submittal for the gravel (tr. 2/48-49). But as Mr. Lawrence testified, the Corps demanded proof that the gravel that the contractor delivered to the site is from the approved source by presenting proof in the form of a ticket; without the ticket the Corps will not pay for it (tr. 2/49). Mr. Lawrence never received any tickets for the gravel delivered to the site (tr. 2/50).

110. Further, when shown a March 2012 photo of the headquarters building foundation, Mr. Lawrence testified that he never received any tests that demonstrated that the concrete was acceptable (tr. 2/58). He testified that he could see cracks and deformed work and rebar that had not been inspected properly by MOQA and that the Corps had planned to reject the work (*id.*).

111. Finally, with respect to the sand and gravel that remained on site after MOQA finally removed most of the other materials and equipment (*see* finding 105) Mr. Lawrence did not know what happened to it. However, he testified that he knew that the replacement contractor did not use it because the Corps would not have paid for it (tr. 2/63).

112. With respect to the materials, construction, and equipment left on site, MOQA's claim simply stated that they "could not be sold or removed" from the site (R4, tab 177 at 2). At the hearing, Mr. Hamidi elaborated on this, contending more or

less that the Corps ignored its requests for help after the Afghan government barred MOQA from removing the property and then expropriated it (tr. 6/284-85, 289-90). Mr. Hamidi also testified the he considered the damages that MOQA sought to be reasonable and properly allocated to this contract (*id.* at 280).

113. Mr. Hamidi also testified concerning MOQA's pay estimate No. 3 dated 1 October 2011 (tr. 6/281; R4, tab 239). In that pay estimate, MOQA contended that it had completed 57% of the work and was entitled to payment of more than $959,000. Notably, however, the first page of this document contains the term "T4D", a common abbreviation for termination for default. Accordingly, we find that MOQA did not submit this document until sometime after the termination for default, which, in our view severely limits its usefulness for determining MOQA's level of completeness on 1 October 2011.

114. The largest differences between MOQA's claim for unpaid work and the amount paid to MOQA relate to the compound size change and differing site conditions modifications. In the final payment to MOQA, COR Champine calculated that MOQA had earned 21% ($84,761.38) of the $406,000 provided in Mod. A00003 for the compound size change (ex. G-5). MOQA contended in its claim that it is entitled to the entire $406,000 (R4, tab 177 at 77). COR Champine also calculated that MOQA was entitled to 27% ($126,240.49) of the $475,000 for Mod. P00003, the differing site condition (ex. G-5). MOQA contended in its claim that it is entitled to half of this amount, or $237,500 (R4, tab 177 at 77).

115. With respect to the compound size change, the largest component of this work was a wall around the new perimeter (tr. 5/218). As we have found, this was included in the work that the follow-on contractor removed and replaced (R4, tab 418 at 78, tab 459 at 50). As for the differing site condition, the Corps refused to pay for backfilling and compaction of the replacement fill because MOQA failed to provide compaction test results that COR Champine requested from MOQA (tr. 1/120-21, R4, tab 158 at 2). No such test results are in the record.

116. MOQA did not provide any testimony that explained or substantiated the services of Kevin Cato. MOQA attached invoices from Mr. Cato to the claim but they do not explain what services he performed (R4, tab 177 at 89-115).

117. On 1 February 2016, CO Eileen M. Yorke issued a final decision denying the claim (R4, tab 178). Of the four categories of costs sought by MOQA (*see* finding 107), CO Yorke specifically addressed only MOQA's claim for $842,587.23 for unpaid pay requests; she concluded that MOQA failed to demonstrate that it was entitled to any additional payment (*id.* at 4).

26

118. MOQA filed a timely notice of appeal of that decision on 22 February 2016, which we docketed as ASBCA No. 60456.

119. The government has not made a claim for re-procurement costs.

## DECISION – ASBCA No. 57963

### A. Standard of Review

The Default clause of the contract (FAR 52.249-10(a)-(b), (d)) provides in relevant part: "If the Contractor refuses or fails to prosecute the work, or any separable part, with the diligence that will insure its completion within the time specified in this contract, including any extension...the Government may, by written notice to the Contractor, terminate the right to proceed with the work." The clause provides that the contract shall not be terminated if the delay is caused, among other things, by acts of the government in its sovereign or contractual capacity. The clause further provides that the rights and remedies of the government in this clause are in addition to any other rights and remedies provided by law or under the contract. (Finding 99)

In default cases involving a contractor's failure to make sufficient progress, the government may justify the termination by demonstrating that there was no reasonable likelihood that the contractor could complete the entire contract in the time remaining for performance. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). The Corps has clearly met this burden. Photos taken after the termination show MOQA having completed a foundation that the Corps quality assurance representative found to be defective, and not much more (finding 110). MOQA does not contend that it could have completed the project in the 22 days that remained on the contract at termination. MOQA's own expert opined that a reasonable completion date would have been 27 May 2012 (finding 7). (We do not accept this 27 May 2012 completion date because it would have required MOQA to achieve a level of proficiency that had thus far eluded it on the project (*see, e.g.*, findings 89-98) but this date is useful for discussion purposes.)

### B. MOQA has Not Demonstrated That its Delay was Excusable

The burden shifts to MOQA to show that its non-performance was excusable. *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996). MOQA's counsel summarized its contentions at closing argument as follows:

> I know that there's a lot of complex facts here, but it's very simple. We should have been given more time. Because of differing site conditions, the collapsible soil, because of Government caused delays, the suspension of time, and also

27

the Government's delay in even negotiating things, right.
We should've just been given more time.

(Tr. 8/240-41)

MOQA has to prove that the Corps delayed the project by more than six months to bridge the gap from the 22 November 2011 contract completion date to 27 May 2012, the date specified by its expert. After thoroughly examining the record and MOQA's briefs, we conclude that MOQA's case has four basic flaws: 1) it has not provided a credible analysis of government delays; 2) it has not accounted for the release language in the bilateral modifications that resolved three major delays; 3) it has not accounted for its own considerable delays; and 4) it has no fallback position to explain the delays from June to October 2011 if we reject its contention that Mr. Khadaam sabotaged its performance. The first two points are closely related and we will take them together.

There is no dispute that there was delay for which the government was responsible. The license for construction, the compound size change, and the resolution of the collapsible soils delayed the project and increased MOQA's costs (findings 7, 11, 33). However, for each of these delays MOQA signed bilateral modifications in which it agreed that it had been compensated in full and would perform the work in the time specified (*id.*). MOQA's closing argument indicates that it believes it should have received more time in the modifications. But it is well settled that release language in modifications is enforceable. *Bell BCI Co. v. United States*, 570 F.3d 1337, 1340-41 (Fed. Cir. 2009).

MOQA's brief addresses to a certain extent the release language in the modifications. While not entirely clear, the crux of its argument appears to be a contention that the language in Mod. P00003 should be construed narrowly so that it only releases the work involved in removing the collapsible soil and replacing with acceptable fill (app. br. at 80-83). The government seems to agree, stating in its reply brief that the release language applies only to the work specified in RFP-0003, that is, removing the collapsible soil and replacing it with acceptable fill (gov't reply at 7).

We also agree but this does not get MOQA very far. With the modification release language taking the delays due to the license for construction, the compound size change, and the collapsible soils removal/replacement off the table, there is not all that much government delay MOQA can point to. One such period of time might be from the issuance of RFP-0002 on 1 February 2011 until its cancelation on 9 March 2011. The direction from the Corps in this RFP was somewhat confusing because it at least suggested that MOQA should hold off on redesigning the footings, something that was required by the contract (*see* findings 29-30). But MOQA has not proven how much of this time period should be considered government-caused delay. MOQA has not adequately explained why the one-week response requested by the Corps was

28

unreasonable. Nor has it explained why more than five weeks went by without MOQA submitting a proposal or explaining to the Corps why it was unable to submit one. Thus, it appears that MOQA's inaction prolonged the delay caused by the issuance of RFP-0002. Moreover, MOQA has not demonstrated that any government delay was not concurrent with the compound size change delay for which the Corps provided a time extension.

Similarly, MOQA appears to contend that the nearly two months between the issuance of RFP-0003 and the execution of Mod. P00003 (findings 31-33) was not released by the modification and should be considered government delay. Even if we were to rule that MOQA did not release the delay during this time period, MOQA has not demonstrated how much of this delay should be charged to the government rather than MOQA due to its submission of an inflated initial proposal that required multiple revisions (findings 32-33).

The difficulty of MOQA's burden is illustrated by the decision of the Court of Appeals for the Federal Circuit in *Empire Energy Management Systems, Inc. v. Roche*, 362 F.3d 1343 (Fed. Cir. 2004). In the underlying decision that was the subject of that appeal, we held that a termination was justified because the contractor would have required an additional 154 days to complete the project but had proven only 53 days of excusable delay. *Id.* at 1349 (citing *Empire Energy Management Systems, Inc.*, ASBCA No. 46741, 03-1 BCA ¶ 32,079 at 158,552). In affirming our decision, the Federal Circuit considered contentions by the contractor that would have increased the number of excusable delay days to 106, but held that even this number was not enough for the contractor to meet its burden because it was short of the required 154 days. *Id.* at 1351.

Accordingly, in this appeal, even if we attributed three months of delay to the Corps due to RFP-0002 and -0003, MOQA is still a long way from meeting its burden of proving more than six months of delay. Other government delays discussed in our findings (providing comments on the initial geotechnical report five days late (finding 23) and requiring a collapsible soils test that took one to three days to perform (finding 24)) are far too little to get MOQA to more than six months of government caused delay.

To demonstrate more than six months of delay, MOQA would have to show that the entire period from its 1 December 2010 submission of the geotechnical report until the execution of Mod. P00003 on 28 May 2011 were USACE delay days, plus it would need to find a few days elsewhere. MOQA cannot show that the government bears anywhere near this level of fault, which brings us to our third point.

MOQA has not accounted for any of its own delays. In the contract, MOQA accepted responsibility for the design and agreed to redesign the footings if there were problems with the soil. When soil problems occurred, it responded slowly (or not at all) and could not solve them on its own (findings 25, 27, 30, 32-33). MOQA waited until

29

1 December 2010 to submit the initial geotechnical report, then inexplicably took nearly 8 weeks to resubmit that report after the 20 December 2010 USACE comments, and took another month to resubmit it after the Corps "C" coded it for a second time; took more than 5 weeks to resubmit the 10% design after the initial "C" code; took 12 weeks to submit the 65% design after approval of the 10% design, and took an additional 5 weeks to resubmit it after the Corps "C" coded the first submission (findings 18, 25, 27, 35-38). MOQA only has itself to blame for these delays.

Finally, because we have rejected MOQA's allegations against Mr. Khadaam, we hold that MOQA bears sole responsibility for the delays from June to October 2011. As we found, MOQA failed to staff the project adequately, failed to timely submit and gain approval of a borrow source, failed to keep an SSHO on the project, failed to submit an adequate recovery plan, failed to keep its major subcontractor on the project, and failed to submit a plan for night work (findings 84-85, 90-98). During this time period MOQA squandered its chance to show the Corps that it could complete the project in a timely and workmanlike manner.

C.    Additional Bases for Termination

The government need only prove one sufficient basis for the termination for default. *Quality Trust Inc.*, ASBCA No. 59983, 16-1 BCA ¶ 36,368. As we found, however, the contracting officer also based the termination on a failure to provide an adequate Accident Prevention Plan, and MOQA's repeated failure to establish and implement an adequate Quality Control Program. But we can uphold a termination for reasons not cited by the contracting officer in his decision. *Empire Energy*, 362 F.3d at 1357.

At the hearing, the government had somewhat greater ambitions, producing evidence that the termination was justified for what could be described as an across the board failure of MOQA to meet its contractual obligations. The government has proven that MOQA: 1) failed to submit schedules that complied with the contract (findings 41-45, 82, 90-98); 2) failed to timely submit its 65 and 90% designs and never submitted a 100% design (findings 35-39); 3) failed to provide other submittals in a timely manner (findings 46-50, 53); 4) failed to have a qualified SSHO/safety manager on the project at all times (findings 58-63); 5) engaged in misleading conduct by providing the government with falsified resumes for the SSHO and altering UPVC pipe to give the impression it was acceptable (findings 59-63, 70); and 6) failed to perform work of the quality required by the contract (finding 110). Precedent from the Federal Circuit and this Board contain numerous examples of default terminations upheld for comparable reasons. *M.C. & D. Capital Corp. v. United States*, 948 F.2d 1251, 1256 (Fed. Cir. 1991) (failure to provide specified roof and correct deficiencies, and leaving the job site); *Discount Co. v. United States*, 554 F.2d 435, 441 (Ct. Cl. 1977) (failure to provide work schedule bolstered government's position that it was justifiably insecure about timely completion); *Universal Fiberglass Corp. v. United States*, 537 F.2d 393, 398 (Ct. Cl. 1976) (contractor was not

30

making progress, did not have necessary parts and had allowed labor force to wither away); *Michael C. Avino, Inc.*, ASBCA No. 31752, 89-3 BCA ¶ 22,156 (altering test reports to falsely show concrete met strength specification); *Korean Maintenance Co.*, ASBCA No. 31796, 88-3 BCA ¶ 21,155 (poor performance, poor work force organization, inadequate quality control); *see also 5860 Chicago Ridge, LLC v. United States*, 104 Fed. Cl. 740 (2012) (chronically leaky roof).

As the record demonstrates, this contract presented considerable challenges. While the Corps provided MOQA with a design, the contract allocated the risk of the design to MOQA, placed the burden of producing a geotechnical report and determining soil conditions on MOQA, and required MOQA to redesign if the soil conditions were below specified parameters (findings 20-21, 28). Moreover, the contract required construction to take place in a remote and dangerous section of Afghanistan that had extreme weather (findings 2-3). While we recognize these challenges, the Board cannot reallocate risk to the government when the contractor suffers adverse consequences from that freely accepted risk. *Dot Systems, Inc. v. United States*, 231 Ct. Cl. 765, 768 (1982); *Natus Corp. v. United States*, 371 F.2d 450, 457-58 (Ct. Cl. 1967).

The record indicates that MOQA did not have the project level management necessary to perform this construction contract for the Corps. Its complaints about the required paperwork (finding 69 n.4), its inability to produce timely and compliant submittals (*e.g.*, findings 47, 50), and its disregard for project safety and quality standards (*e.g.*, findings 57-63) all suggest that it was not prepared for what it was getting into. Although MOQA appears to be a small foreign contractor without a long history of performing contracts for the U.S. Government, we cannot excuse MOQA on this basis because "[a] Government contractor, regardless of its size, locality or experience, is bound to understand the complexities and consequences of its undertaking." *Tony Downs Foods Co. v. United States*, 530 F.2d 367, 374 (Ct. Cl. 1976) (citing *Massachusetts Port Authority v. United States*, 456 F.2d 782, 784 (Ct. Cl. 1972)).

ASBCA No. 57963 is denied.

## ASBCA No. 60456

Having upheld the termination for default, the immediate question is whether there is anything left for the Board to decide with respect to MOQA's monetary claim. In general, a construction contractor who has been terminated for default is entitled to payment for work that was properly performed in accordance with the contract prior to the default termination. *J.G. Enterprises, Inc.*, ASBCA No. 27150, 83-2 BCA ¶ 16,808 at 83,543. But the government contends that we lack jurisdiction because MOQA's claim seemed to be predicated on conversion of the default to one for termination for the convenience of the government (*see* gov't suppl. br. at 3-4; finding 107).

31

While not a model of clarity, we conclude that MOQA's claim clearly communicated the notion that it performed work for which it had not been paid. The contracting officer appears to have understood this because her decision analyzed whether MOQA had been paid everything to which it was entitled (*see* finding 117). Accordingly, we possess jurisdiction. *See Scott Timber Co. v. United States*, 333 F.3d 1358, 1365-66 (Fed. Cir. 2003).

As set out in its claim, MOQA seeks payment of $624,740 for materials and $227,915 for construction and machinery left on site (finding 107). Our findings require us to reject this claim. To the extent that MOQA left anything of value at the site after the termination, MOQA created this problem for itself. As we have found, COR Champine directed MOQA to vacate the site and remove its property on the day after termination (finding 100). MOQA failed to do so, lingering for six months in an apparent hope that the Corps would change its mind about the termination (finding 102). To the extent that materials or equipment were damaged by the weather, stolen, or experienced other problems during this time period, MOQA only has itself to blame. Moreover, the contemporaneous daily reports indicate that MOQA did, in fact, remove all of its materials and equipment, with the exception of sand, gravel, and stones (finding 104), which we conclude is the best evidence of the disposition of this property.

Finally, this portion of the claim also fails because Mr. Hamidi's testimony does not support liability for the U.S. Government. In its post-hearing briefs, MOQA states that it is entitled to be paid for materials and equipment taken by "the Government," presumably meaning the U.S. Government (app. br. at 96; app. supp. br. at 5). However, Mr. Hamidi testified that it was actually the Afghan government that took the property (finding 112). The United States is not responsible for the sovereign acts of other countries and it is therefore not liable to MOQA if the Afghan government took the materials and equipment. *Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1364 (Fed. Cir. 2016).

MOQA also seeks $842,587.23 of unpaid pay requests for work performed through the date of termination. As we found, the Corps paid MOQA $642,840.63, or 25% of the contract price of $2,572,449.11 (findings 100-01). MOQA has not proven that it was entitled to more. Our findings indicate that MOQA struggled at nearly every aspect of performing this contract (*see* findings 25, 27, 37, 39, 41, 44-45, 47, 49-50, 53, 57-63, 70-71, 76, 84-85, 89-98). Based on MOQA's performance and the testimony of Mr. Lawrence, the quality assurance representative, concerning the problems with the concrete and rebar placed by MOQA, we conclude that the contracting officer did not abuse his discretion in having the replacement contractor remove most of the work placed by MOQA and start over (*see* findings 103, 110). In essence, MOQA received 25% of the contract price even though it did not accomplish much more than excavating the site (*id.*). There is no credible evidence to support a higher payment to MOQA.

Finally, with respect to the $169,418.22 of consulting fees allegedly paid to Mr. Kevin Cato, MOQA admits in its supplemental brief that it would not be entitled to these amounts if the Board did not convert the termination to one for the convenience of the government (app. supp. br. at 9). Even if MOQA could pursue these costs without conversion of the termination, we would deny them because MOQA has not proven what services Mr. Cato performed, or why they were reasonable in terms of effort and price. *See Vistas Construction of Illinois, Inc.*, ASBCA No. 58479 *et al.*, 16-1 BCA ¶ 36,236 at 176,796-99.

We deny ASBCA No. 60456.

## CONCLUSION

For the foregoing reasons, ASBCA Nos. 57963 and 60456 are denied.

Dated: 7 November 2017

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

33

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57963, 60456, Appeals of MOQA-AQYOL JV, LTD., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals